**DISTRICT OF COLUMBIA, Appellant,**

v.

**WICAL LIMITED PARTNERSHIP, Appellee.**

**No. 91–CV–762.**

District of Columbia Court of Appeals.

Argued Dec. 15, 1992.
Decided July 29, 1993.

---

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC, were on the brief, for appellant.

C. Francis Murphy, with whom Louis P. Robbins, Washington, DC, was on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

The District of Columbia appeals from a Superior Court order, entered pursuant to an award of partial summary judgment, directing the District's Department of Consumer and Regulatory Affairs (DCRA) to issue a building permit to Wical Limited Partnership, a developer of residential and commercial housing. The permit which the trial judge ordered the DCRA to issue would have authorized Wical to construct a development in the vicinity of the official residence of the Vice President of the United States. The proposed development was to include two towers. Its construction had been opposed by the United States Secret Service, and was eventually proscribed by the Council of the District of Columbia, because of concerns that the development would jeopardize the safety of the Vice President and his family unless the height of the towers was significantly reduced.

The trial judge issued the order from which the District now appeals after the District had made an unexpected and extraordinary concession during the proceedings below. Specifically, trial counsel for the District explicitly took the position that local legislation which had been enacted by the Council to accommodate the concerns of the Secret Service, and which was aimed directly at Wical's proposed development, had no application to the present case. Eschewing the statute which owed its existence to Wical's project, the District relied instead on a number of procedural contentions which it now acknowledges to be lacking in merit.

In spite of its contrary position in the trial court, the District now seeks to invoke the legislation which it spurned below. Wical contends that any error in the trial court's failure to apply the legislation was "invited," and that the District is absolutely precluded from complaining of it on appeal. In response, the District acknowledges the existence of the general requirement that litigants must preserve in the trial court issues which they propose to raise on appeal, but suggests that, at least in cases such as this one, this requirement applies to the District as the protector of the public interest only in a very loose and permissive way.

■ We are not prepared to adopt Wical's apparent position that an appellate court may *never* reverse "invited error." We also view the District's relaxed view of its burden as difficult to reconcile with authority holding that, in the absence of a statute or rule of court to the contrary, a municipal corporation is subject to the same rules that apply to private parties. Although we recognize that, in cases of this kind, courts must always include in

their calculus the effects of their decisions on the public interest, the obligation to preserve issues for appeal applies with full force to the District, and courts are properly reluctant to reverse for invited error irrespective of the identity or status of the appellant.

We need not, however, define with precision the showing which the District must make in order to secure a reversal for error which it has invited. Under *any* standard except the absolute one advocated by Wical, reversal is required here. We so hold because, even if Wical's rights are ultimately found to have been violated as alleged, it will have an obvious remedy at law, and can be made whole by an award of damages. It was therefore error by the trial judge in effect to issue an injunction requiring the District to permit the erection of towers which would compromise the safety of the Vice President. Accordingly, we reverse the judgment and remand the case for further proceedings consistent with this opinion.

## I.

## THE FACTS

*A. Background*

In 1986, Wical purchased a one-acre parcel of land on Wisconsin Avenue, N.W., near Calvert Street. The property borders on the United States Naval Observatory. In December of that year, Wical applied to the District of Columbia Zoning Commission for approval of a Planned Unit Development (PUD) and for zoning changes. In the spring of 1987, the Commission held public hearings on Wical's application. Representatives of the Secret Service and of the Department of the Navy opposed the application and, in July 1988, the Commission denied it. *See* Zoning Commission Order No. 578, 35 D.C.Reg. 6728 (1988). The Commission found, among other things, that Wical "had not adequately proposed measures to address the protection of the Vice President's home," and that the planned construction would interfere with the observatory's sophisticated reading

equipment, which is used in surveillance and missile guidance.

In November 1987, during the pendency of the proceedings before the Commission, Wical filed an application, consistent with then-current zoning requirements, for leave to construct two towers on the property, one a commercial building seven stories high, and the other an apartment building with six stories. By the following November, several sub-units of the DCRA had approved the application, but "White House Clearance" had not been received.

According to the DCRA administrator then responsible for land-use matters, Hampton Cross, it has been District policy since 1984 to ask the Secret Service to review proposals for residential or commercial construction in the vicinity of the White House or of the Vice President's residence. In late 1988, the Secret Service advised Mr. Cross that it was opposed to Wical's plans because the construction of the towers would present unspecified dangers to the Vice President and his family. The Secret Service took the position that, in order to ensure the Vice President's security, the proposed towers would each have to be reduced by two floors. In light of the views of the Secret Service, the DCRA decided that the permit should not be issued.

During November and December 1988, Sylvan C. Herman, Wical's general partner, met with Secret Service officials to determine whether an accommodation could be reached. Mr. Herman refused, however, to modify his plans for the property, insisting that the height reductions demanded by the Secret Service would render the project uneconomical. He decided that further discussions would be futile, and demanded that the DCRA issue the building permit.

In March 1989, Mr. Cross formally denied Wical's application. He advised Wical that

[a]s you are aware, approval from the Secret Service is essential before we issue a Building Permit that impacts upon the safety of the Vice President of the United States.

Following discussions with the Secret Service, the Office of the Corporation Counsel has advised me that no permit for the property should be issued for reasons of security, safety and the welfare of the Vice President. Please be advised that nothing herein prevents you from refiling revised plans which are in accordance with health and security concerns mentioned above.

Wical filed an administrative appeal, and the Board of Appeals and Review (BAR) ordered that the building permit be issued "forthwith." The Board held that the DCRA had no basis for denying Wical's application, because

1. The application for Building Permit filed in the above-captioned matter is in full compliance with all applicable laws and regulations of the District of Columbia.

2. The sole basis for the denial of the permit by the District of Columbia was the failure of the appellant to secure the approval of the United States Secret Service.

3. There is no law or regulation which requires the approval of the United States Secret Service to issue the permit in question.

Order of July 10, 1989. The Board denied a request to stay its order.

### B. The Legislative Response

On the day following the Board's decision, the Council enacted emergency legislation authorizing (and in effect mandating) the denial of building permits when such action was necessary to protect the President or Vice President. D.C.Act 8–60, 36 D.C.Reg. 5037 (1989). The emergency act provided:

No permit required under the Construction Codes shall be issued after the effective date of this act if it is determined by the Director of the Department of Consumer and Regulatory Affairs that the United States Secret Service has established that the issuance of the permit will adversely impact the safety and security of the President or Vice President of the United States.

In an accompanying resolution, the Council recited the history of Wical's application and concluded that the imminent issuance of the permit created an "immediate crisis" of sufficient magnitude to warrant the enactment of emergency legislation "authoriz[ing] the denial of an application for a building permit when it is determined to be necessary to protect the safety and security of the residence of the Vice President...." Res. 8–87, § 2(a), 36 D.C.Reg. 5296 (1989).

The initial emergency legislation expired on October 10, 1989. Wical immediately renewed its demand for a building permit but, in spite of the absence of any legislation authorizing denial of the permit, the Department declined to issue one to Wical. Its refusal to do so was at least arguably contrary to a DCRA regulation which specifies that "[t]he Director [of DCRA] shall take immediate action in accordance with the decision of the Board of Appeals and Review." 12 DCMR § 122.4 (1987).

On November 2, 1989, more than three weeks after the expiration of the initial emergency legislation, the Mayor signed a second emergency act, which was identical in substance to the first. D.C.Act 8–106, 36 D.C.Reg. 7742 (1989). By its terms, the legislation was to "apply to each permit application that has not been granted by the Mayor on the effective date of [this] Construction Codes Revised Amendment Emergency Act of 1989." The accompanying resolution declaring the emergency referred to the Wical project and expressed the fear that "[w]ithout emergency legislation, the Department may be forced to issue the permit." Res. 8–122, 36 D.C.Reg. 7769–7770 (1989).

On January 30, 1990, the second emergency act was superseded by an identical temporary law which had been signed by the Mayor and transmitted to Congress in October 1989. D.C.Law 8–58, 36 D.C.Reg. 7382 (1989), 37 D.C.Reg. 1208 (1990); see D.C.Code § 5–1303 note (1991). The new temporary legislation stated, as had its predecessor, that its proscriptions would "apply to each permit application that has not

been granted by the Director of Consumer and Regulatory Affairs on the effective date of this act."

On February 27, 1990, without any further gap, the temporary act was replaced by permanent legislation which has been in effect since that date. *See* D.C.Law 8–70, 36 D.C.Reg. 7744 (1989) & 37 D.C.Reg. 1613 (1990), codified as D.C.Code § 5–1303(d) (1991). The permanent legislation provides:

> (1) No permit required under the Construction Codes shall be issued if it is determined by the Mayor that:
>
>> (A) The permit affects an area in close proximity to the official residence of the President or the Vice President of the United States; and
>>
>> (B) The United States Secret Service has established that the issuance of the permit would adversely impact the safety and security of the President or Vice President of the United States;
>
> (2) This subsection shall apply to each permit application that has not been granted by the Mayor by February 27, 1990.

Like the temporary and emergency measures which preceded it, the permanent law was enacted to serve a general need, namely the protection of the President and Vice President. The Council's particular focus, however, was once again on the Wical project which precipitated the legislation. According to the Committee Report, the act

> codif[ies] ... an existing informal procedure, by which the District of Columbia and United States governments have cooperatively reviewed building permit applications, for locations near the White House and Naval Observatory, to determine potential adverse effects upon the safety and security of the nation's highest elected officials.
>
> The intent of the legislation is to authorize clearly the building permit review and denial procedure as a means of restricting the height and proximity of proposed construction, which is located in close proximity to the White House or Naval Observatory, and which is deemed

to be a threat to the safety and security of the President or Vice President. The legislation applies to any building permit that has not been issued prior to the effective date of the legislation, *including the permit application for a proposed building at 2323 Wisconsin Avenue, N.W.*, the proposed height of which has been determined by the Secret Service to threaten the safety of the Vice President.

Report of the Chairman, Committee of the Whole, on Bill 8–345, Oct. 10, 1989, at 2 (emphasis added).

The Council's action was based in part on a statement by the Director of the Secret Service describing security considerations which had generated his agency's opposition to Wical's plans:

> The Secret Service has long been concerned about the dangers posed by building development in close proximity to the White House and the Vice President's residence at the Naval Observatory.
>
> Certainly, past history has more than clearly demonstrated the terrible destruction which can be caused by a lone sniper from a position of high ground. The assassination of President Kennedy is the most tragic example of these type[s] of incidents.
>
> The sniper threat is very real today. Military as well as civilian sniper training in the United States routinely provide people with the ability to shoot a rifle with great accuracy from 500–600 yards. It is not uncommon to find persons with the ability to hit the intended target from as much as 1000 yards. In addition, other more sophisticated weapons of war, such as rockets, could be launched from high ground vantage points.
>
> Over the years, the Secret Service has attempted to work with developers of buildings to minimize these security concerns. D.C.Bill 8–345 would provide a basis for the Secret Service to express these concerns and, thereby, greatly assist the Secret Service in its efforts to provide a safe and secure environment around the White House and the Vice President's residence.

## C. *Proceedings Below*

Wical filed the present suit on August 3, 1989, after the BAR order was issued and during the period when the initial emergency legislation was in effect. In Count I of its Complaint, the developer prayed for an injunction ordering the Department to issue a building permit. In Counts II and III, Wical challenged the emergency legislation as unconstitutional on its face and as applied, and asked that its enforcement be enjoined. Wical alleged that the legislation "appropriate[d] private property ... for the benefit of property owned by the United States without providing for just compensation...." In Count IV, Wical claimed that the legislation violated the Home Rule Act because it "concerns the functions or property of the United States." Finally, in Count V, Wical maintained that it had been deprived of property without due process of law. Relying on 42 U.S.C. § 1983, Wical prayed for damages in the amount of $3,500,000.

The District moved to dismiss the complaint, claiming that Wical had made a series of jurisdictional and procedural errors. The District contended that the Board of Zoning Adjustment, and not the Board of Appeals and Review, was the proper forum for any challenge to the denial of the building permit. Moreover, according to the District, Wical should have sought review or enforcement of the BAR's decision in the District of Columbia Court of Appeals, rather than in the Superior Court.

All of these procedural contentions were rejected by the Superior Court. Judge Rufus King denied the District's motion to dismiss without opinion. Two further motions by the District, based on essentially the same grounds, were subsequently denied by Judges Nan R. Huhn and Harold Cushenberry.

Having successfully opposed the District's procedural motions,[1] Wical filed its own motion for summary judgment with respect to Counts I through IV of the complaint. At the hearing on that motion,

counsel for Wical argued that the District's refusal to issue the building permit deprived it of property without due process of law. Acknowledging the general rule that the court must apply the law in effect at the time that it renders its decision, *see, e.g., United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801), Wical argued that this rule did not apply in the present case because its application would condone governmental wrongdoing and would result in manifest injustice. Plainly, counsel for Wical believed that D.C.Law 8–70, which had been enacted with this very project in mind, was relevant to the case.

When counsel for the District responded, however, she told an obviously astonished Judge Herbert Dixon, who was presiding over the hearing, that the District was not relying on the legislation at all:

> COUNSEL FOR THE DISTRICT: These plaintiffs did not get a permit before that statute was passed and plaintiffs, by their own statement in a memorandum, say that, "When the temporary legislation had expired and no legislation was in effect on October 13th, 1989, they again asked for the permit and they were again denied."

So the District is not basing its denial on this legislation. It denied it before the legislation was passed.

> THE COURT: Say that again.

> COUNSEL FOR THE DISTRICT: The District is not denying—is not basing its denial of their building permit on this legislation.

> THE COURT: That is the District's position—

> COUNSEL FOR THE DISTRICT: Yes.

> THE COURT: —in this litigation?

> COUNSEL FOR THE DISTRICT: Yes. This statute does not apply to these plaintiffs.

> THE COURT: I want to make sure I am not misunderstanding.

---

1. In its brief in this court, and again at oral argument, counsel for the District effectively conceded that the contentions raised by the District below were without merit. None of these contentions has been presented to this court on this appeal.

COUNSEL FOR THE DISTRICT: Yes, Your Honor.

THE COURT: The District's denial of the permit in this case is not based on this legislation?

COUNSEL FOR THE DISTRICT: Correct, Your Honor.

THE COURT: Okay.

COUNSEL FOR THE DISTRICT: Moreover, plaintiffs' argument about whether or not the Council had the authority to pass this legislation, the Court need not reach that. The reason is that this Court does not have jurisdiction to hear what plaintiffs have called a constitutional tort, a Motion for Summary Judgment, which is basically nothing more than an adverse agency decision, a contested case hearing, over which Superior Court lacks jurisdiction to hear.

The only court, the Court of Appeals for the District of Columbia has exclusive jurisdiction to hear such a case.

Now, yes, we argued in our Motion to Dismiss that the Board of Appeals and Review never had jurisdiction to hear their case, and they didn't. The statute is clear on its face.

On April 22, 1991, Judge Dixon delivered a comprehensive oral decision. In light of the District's position at the hearing, however, almost all of the judge's analysis was addressed to the District's ill-fated jurisdictional contentions. The judge held that his three colleagues' decisions regarding these jurisdictional issues constituted the law of the case. The judge also stated, in conformity with the position taken by the District when the motion was argued, that

the law at issue was not in effect at the time plaintiff applied for their building permit or filed their appeal to the Board of Appeals and Review. This court finds that the subsequent law did not change plaintiffs' right to have the permit issued.

The judge therefore granted partial summary judgment to Wical on Count I and

ordered the District to issue the building permit. Pursuant to Super.Ct.Civ.R. 54(b), the judge made an express determination that there was no just reason for delay, and he entered final judgment as to Count I only. He then stayed his order pending review by this court. This appeal followed.

## II.

### LEGAL DISCUSSION

*A. Identification of the Issue*

As the reader will doubtless discern from the preceding discussion, there has been no trial in this case and, if no early settlement is reached, the proceedings in the trial court are far from over. Although the trial judge issued a "final judgment" with respect to Count I of the complaint, his order did not in fact dispose of the entire case. Indeed, we have jurisdiction of the appeal only because the judge made the determination required by Super.Ct.Civ.R. 54(b).[2]

Accordingly, the only question properly before us is whether the trial judge erred when he ordered the District to issue a building permit to Wical. As the District correctly points out in its brief,

[t]his [c]ourt need not decide whether a taking has occurred. That should be an issue resolved by the trial court in the first instance on remand. The remaining counts of the complaint raise legal and factual issues which that court must address before it will be possible to determine whether the District legislation has resulted in a compensable taking.

In spite of its apparent recognition that "just compensation" and "due process" issues are not before us, the District suggests that

[t]he [c]ourt may, however, wish to give the trial court guidance,

and then goes on to discuss *in extenso* the very issues which it has conceded in the immediately preceding sentences of its submission that this court "need not decide."

---

**2.** Arguably, the judge's order was also immediately appealable as one granting an injunction. *See* D.C.Code § 11-721(a)(2)(A) (1989); *Hercu-*

*les & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 35 (D.C.1989).

Wical has understandably responded to the District's substantive arguments on the subject with which the District seeks to tempt us, so that the greater part of the legal discussion in both parties' briefs concerns questions which may possibly become ripe for resolution at some future date, but which are not ready for decision at this stage of the case.

■ The suggestion that this court may "wish to give the trial court guidance" on an issue not yet presented amounts to a request that we write an advisory opinion. This court has no authority to issue advisory opinions regarding questions which may or may not arise. *Smith v. Smith*, 310 A.2d 229, 231 (D.C.1973); *see also Allen v. United States*, 603 A.2d 1219, 1228–29 n. 20 (D.C.1992) (en banc). "Courts should not decide more than the occasion demands." *Younger v. Smith*, 30 Cal.App.3d 138, 153, 106 Cal.Rptr. 225, 235 (1973). Like the Supreme Court of Washington,

> [a]s a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such necessity, particularly when the question is a constitutional one, or involves the construction of a statute. *See generally*, 21 C.J.S. *Courts* § 182 (1940).

*Johnson v. Morris*, 87 Wash.2d 922, 929–30, 557 P.2d 1299, 1305 (1976) (en banc); *see also Local No. 8–6, Oil, Chemical and Atomic Workers Int'l Union v. Missouri*, 361 U.S. 363, 367–68, 80 S.Ct. 391, 394, 4 L.Ed.2d 373 (1960). We therefore confine ourselves to a resolution of the only question fairly presented to us by this appeal, namely, whether the trial judge committed reversible error, under the unusual circumstances of this case, by ordering the District to issue the building permit.

*B. Invited Error*

It is undisputed that the District not only failed to make any contention in the court below that D.C.Law 8–70 applies to this case, but explicitly asserted that it does *not* apply. The District now finds itself in the unenviable position of having to argue in this court the exact opposite of what it told the trial judge.

■ Courts do not look with favor on abrupt reversals of direction by litigants as they proceed from one court to the next. In general, "parties may not assert one theory at trial and another on appeal." *D.D. v. M.T.*, 550 A.2d 37, 48 (D.C.1988) (quoting *Hackes v. Hackes*, 446 A.2d 396, 398 (D.C.1982)). Judge Spottswood Robinson stated the applicable principles well for the court in *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967):

> In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination, and points not asserted with sufficient precision to indicate distinctly the party's thesis, will normally be spurned on appeal. Canons of this tenor reflect, not obeisance to ritual, but considerations of fairness to the court and the parties and of the public interest in bringing litigation to an end after fair opportunity has been afforded to present all issues of law and fact.

*See also D.D. v. M.T., supra*, 550 A.2d at 48, in which we adopted in its entirety the foregoing passage from *Miller*.

■ The foregoing rule is an essential one, for "[e]normous confusion and interminable delay would result if counsel were permitted to appeal upon points not presented to the court below." *Johnston v. Reily*, 82 U.S.App.D.C. 6, 7, 160 F.2d 249, 250 (1947). The rule is not, however, absolute. Its rigors should be tempered in "exceptional situations" where "a clear miscarriage of justice would otherwise result." *D.D. v. M.T., supra*, 550 A.2d at 48.

■ In the present case, our review is not merely for "plain error," which is the applicable standard whenever the appellant has failed to preserve in the trial court an argument which he or she seeks to present on appeal. Rather, the District asks us to

reverse the trial court's decision for an "invited error" which the District affirmatively encouraged the judge to make. The former Supreme Court of the District of Columbia stated in broad terms a century ago that "[a] party cannot be heard to complain in an appellate court of that which he has co-operated in doing in a lower court." *Evans v. Schoonmaker,* 2 App.D.C. 62, 71–72 (1893). Put another way, "[a] party may not allege on appeal as error an action which he had induced the tribunal to take...." *Brotherhood of R.R. Trainmen v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 127 U.S.App.D.C. 58, 62, 380 F.2d 605, 609, *cert. denied,* 389 U.S. 928, 88 S.Ct. 289, 19 L.Ed.2d 279 (1967). Seizing on the unrestricted sweep of the language in these and other cases, Wical seems to take the position that the "invited error" doctrine brooks no exceptions, that the District is precluded from challenging a ruling which it encouraged the judge to make, and that this court is therefore compelled to affirm the trial court's order.

We do not agree that the "invited error" doctrine is as unbending as Wical suggests. We stated today in *Cowan v. United States,* 629 A.2d 496, 503 (D.C.1993), that "[c]ourts are especially reluctant to reverse for plain error when it is 'invited.' " Our colleagues across the street have used the same terminology. *United States v. Dale,* 301 U.S.App.D.C. 110, 142, 991 F.2d 819, 851 (1993). To say that the court is "reluctant," or even "especially reluctant," to take an action is quite different from asserting that the court will never do so. In fact, the use of the word "reluctant" implies that there are extreme situations in which a court will overcome its hesitation; the bar is not absolute. If, for example, a trial judge in a school desegregation case were to order that all black children must be taught in one building and all white children in another, because of their race, an appellate court would surely reverse

such a judgment whether or not the appellant invited it in the trial court. Accordingly, the District's *faux pas* below did not erect an impenetrable barrier to our reversing the trial court's order. The burden on the District is a heavy one, but the issue is not foreclosed.

■■■ The District takes the position that the basic principles articulated in *Miller v. Avirom* should be less exactingly applied against it than against a private litigant. This argument is based on the proposition that the District represents the public interest, and that the rights of its citizens should not be compromised as a result of an error by government counsel. The Supreme Court has held, however, that the District is a municipal corporation. *Metropolitan R.R. Co. v. District of Columbia,* 132 U.S. 1, 9, 10 S.Ct. 19, 22, 33 L.Ed. 231 (1889). It is "subject to the ordinary rules that govern the law of procedure between private persons." *Id.* at 9, 10 S.Ct. at 22; *see also* 17 Eugene McQuillin, Municipal Corporations, § 49.10, at 218 (1993). In the absence of a statute providing otherwise, the general rules of pleading, evidence, and trial procedure apply with equal force to actions to which a municipal corporation is a party. 64 C.J.S. *Municipal Corporations* §§ 2207, 2208 & 2210, at 1058, 1065–67 (1950 & Supp.1992). "Parties, prosecutors included, should select the arguments they do and don't make with great care.... 'Procedural rules apply to the government as well as to defendants.' " *United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991) (quoting *Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990)). We recently reiterated in *United States v. Porter,* 618 A.2d 629, 642 n. 24 (D.C.1992), that the principle that parties may not assert one theory at trial and another theory on appeal applies "as rigorously" to the United States as it does to a private litigant.[3] *See also Barry v. Bush,*

---

**3.** We do not think, in light of *Porter,* that any protection which the District may enjoy from the application of the doctrine of estoppel, *see, e.g., Rafferty v. District of Columbia Zoning Comm'n,* 583 A.2d 169, 175 & n. 3 (D.C.1990),

excuses it from the obligation to preserve its grounds for appeal. But *cf. District of Columbia v. Owens–Corning Fiberglas Corp.,* 572 A.2d 394, 406 (D.C.1989) (District of Columbia is immune

581 A.2d 308, 311 (D.C.1990), a case in which we emphatically rejected the District's claim that, as representative of the public at large, it could unilaterally ignore, as contrary to the public interest, a court-approved settlement agreement to which it had consented, but from which it subsequently sought to withdraw its consent as unduly restrictive of the Mayor's prerogatives.

■ To be sure, the public interest may often be implicated in greater measure in cases in which the District is a party than in purely private litigation. Appellate courts need not and should not be blind to such considerations, whether or not any trial court error was "invited." This appeal does not, however, require us to articulate a definitive standard of review for cases in which the government has changed its position. Unless the bar against reversal for invited error is absolute—and we have held that it is not—the relief granted by the trial court in this case cannot be justified.

### C. The Adequacy of the Remedy at Law

■ At the time the trial judge entered his order directing the District to issue the building permit, D.C.Law 8–70 was in effect. This permanent legislation, as we have noted, proscribed the issuance of such a permit if the Secret Service

> has established that the issuance of the permit would adversely impact the safety and security of the President or Vice President of the United States.

D.C.Code § 5–1303(d)(1)(B) (1991). Moreover, the Council had specifically made the legislation applicable "to each permit application that has not been granted by the Mayor by February 27, 1990." Id., § (d)(2). By its explicit and unambiguous terms, D.C.Law 8–70 proscribed the issuance of the permit which the trial judge ordered the District to issue. His order thus cannot be reconciled with the plain language of the statute.

This is not to say that enforcement of the statute could not result in violation of Wical's rights. When the initial emergency legislation lapsed, Wical was arguably entitled, pursuant to DCRA regulations, to the issuance of the requested permit. Moreover, the passage of the legislation had the effect of restricting the uses which Wical could make of its property. Arguably, the District has deprived Wical of property without due process of law, or has effected an unconstitutional "taking" without just compensation, or both. See, generally, Hornstein v. Barry, 560 A.2d 530 (D.C. 1989) (en banc). As noted previously, we take no position on these issues, for they are not properly before us.

■ But assuming, without deciding, that the District has indeed acted in violation of Wical's rights, Wical has an obvious and adequate remedy at law. It may sue the District for damages. Indeed, Wical has done so in this very case, to the tune of $3,500,000. At oral argument, counsel for both parties acknowledged that the fundamental issue raised by this litigation is whether Wical is entitled to compensation. Realistically, nobody is going to build towers which endanger the Vice President; what is really at stake in this case is whether, when it is over, the District will have to pay Wical some money and, if so, how much.

Under these circumstances, there was no justification for an award of equitable relief. The judge, in effect, issued an injunction requiring the issuance of the permit without giving any apparent consideration to the availability of a legal remedy. But "it is axiomatic that equity has no jurisdiction over a controversy for which there is a complete and adequate remedy at law." Marshall v. District of Columbia, 458 A.2d 28, 29 (D.C.1982). As this court explained in District of Columbia v. North Washington Neighbors, Inc., 336 A.2d 828, 829 (D.C.1975) (per curiam),

> [t]he general rule is that an injunction will not be granted where the award of money damages gives full and complete satisfaction for an injury suffered. 43 C.J.S. Injunctions § 25 at 455. The right

from the running of statutes of limitations and

repose when it sues to vindicate public rights).

to sue the District of Columbia for damages for breach of its duty to a citizen is well established.... If the District is liable, money damages would give full and complete satisfaction for the injury suffered. Thus, the injunction having been improvidently issued, the order granting the injunction is [r]eversed. (Citations omitted.)

 These principles apply with particular force to Wical's claim that the District's conduct amounted to an uncompensated taking. Under Just Compensation Clause jurisprudence, legislation regulating private land use constitutes either a permissible exercise of the police power, for which property owners need not be compensated despite a diminution in the value of their properties, or a taking of private property for public purposes, which must be justly compensated. If the legislation is determined to constitute a valid exercise of the police power, for which no compensation is necessary because no property has been "taken," its implementation cannot be enjoined. If, on the other hand, the legislation "takes" Wical's property, the proper judicial remedy is an award of just compensation, not the issuance of an injunction that thwarts the legislative will. As the Supreme Court observed in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984), "[e]quitable relief is not available to enjoin an alleged taking of private property for a public use authorized by law when a suit for compensation can be brought against the sovereign subsequent to the taking." (Footnote omitted). So, too, in *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 315,

107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987), the Court reiterated that the Fifth Amendment "is designed not to limit governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." (Emphasis in original.) We agree with the District that it is evident from the legislation itself, and unmistakable from its legislative history, that the Council was prepared, if necessary, to pay the costs associated with a "taking" rather than to permit Wical to use its property in a manner which could imperil the safety of the Vice President.

 Under these circumstances, we perceive no reasonable basis for the issuance of what amounted to an affirmative injunction directing the District to issue the building permit. Since Wical could be compensated by an award of money damages for any injury it may have suffered, the entry of an order authorizing the construction of buildings which would jeopardize the safety of the Vice President and his family was unnecessary and served no lawful or useful purpose.[4] An order which creates substantial and completely unnecessary peril to the nation's second highest elective officer cannot be sustained under any reasonable standard of review. Although we appreciate the reality that the trial judge's decision was almost certainly precipitated by an improvident concession by the District, and that, in general, under our adversarial system, judges quite reasonably rely on counsel (especially counsel for experienced institutional litigants) to "try their own case," we are compelled in this case to set the judge's order aside.[5]

---

**4.** Wical also contends that the District acted unlawfully and reprehensibly by refusing to issue the building permit when ordered to do so by the Board of Appeals and Review. Assuming without deciding that there is substance to this allegation, the existence of an adequate remedy at law precludes the entry of injunctive relief with respect to this claim as well.

**5.** Counsel for Wical claim that there is no danger to the Vice President because "[t]he United States could have [condemned] and can now condemn an easement to restrict the height of buildings on Wical's property for the benefit of

the adjacent property owned by the United States and used for the residence of the Vice President." *See* D.C.Code §§ 16–1352, –1353 (1989). The United States, however, is not a party to this action (although it has instituted separate proceedings in the United States District Court against the District and Wical to quiet title in a public alley adjacent to Wical's property. *See United States v. District of Columbia, et al.*, C.A. No. 92–514 (D.D.C.)). The District has its own independent interest in the enforcement of its own statute, which was designed to prevent the construction of develop-

## III.

## CONCLUSION

For the foregoing reasons, the order granting partial summary judgment to Wical is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

ments which endanger the President or Vice President, including in particular Wical's project as originally planned. The vindication of this interest cannot be subordinated to, or made contingent upon, any action which a non-party to the present suit may or may not take at some unspecified time in the future.