**Macy G. HALL, M.D.,
et al., Appellants,**

v.

**Antoinette CARTER, Appellee.**

**No. 01–CV–988.**

District of Columbia Court of Appeals.

Argued March 18, 2003.
Decided June 12, 2003.

tion.   Accordingly, Ms. Cook's contention is   unavailing.

Alfred F. Belcuore for appellants.

Daniel P. Sutton for appellee.

Before SCHWELB and REID, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

Antoinette Carter (the Patient) visited Macy G. Hall, M.D. (the Doctor) about a hernia. The Doctor recommended surgery not only to correct the hernia but also to accomplish a reconstructive abdomino-

plasty (tummy tuck), in order to forestall recurrence of the hernia and to achieve a more normal appearance. Apparently because of the Patient's smoking habit, the surgery did not heal and two "debridement" surgeries were necessary before proper healing was accomplished.

This case, alleging the Doctor's malpractice, focuses first on the Doctor's and the Patient's respective responsibilities to make clear how much the Patient smoked—a critical predicate for the decision to go forward with the first operation. Each claims the other was negligent in failing to disclose or elicit the truth. But the Patient claims, in addition, that even if she had been contributorily negligent—a finding that she concedes would ordinarily bar her claim entirely—the Doctor had the "last clear chance" to prevent her injury. As a result, she says, District of Columbia law permits her to recover the $465,000 the jury awarded on that theory. The Doctor—relying on the jury's finding that the Patient indeed was contributorily negligent—replies that this ends the matter; he had no "last clear chance" to avoid the harm.

On this record, we cannot say that the trial judge erred in giving the jury a "last clear chance" instruction; the facts, reasonably interpreted, would sustain a plaintiff's verdict on that theory. Furthermore, the instruction, as formulated, was accurate. Nonetheless, when incorporated into the court's special verdict form, the instruction confused the jury, which sent four notes to the judge requesting clarification. More fundamentally, the verdict form permitted the jury to find that the Doctor's negligence proximately caused the patient's injury without having to find, first, an act of "antecedent negligence," which District of Columbia law requires before a "last clear chance" finding (based on new or renewed negligence) is justified. Accordingly, we must reverse.

## I.

The Doctor had the Patient fill out several forms that sought personal and medical history. He then discussed with her various aspects of the surgery including potential complications—in particular, fat necrosis, partial or permanent numbness, and scar deformity. The Patient then signed a form indicating that she and the Doctor had discussed the surgery in full. During their conversation, after the Doctor had inquired, the Patient revealed that she smoked about half a pack of cigarettes a day. The Doctor responded by casually informing the Patient that he preferred she stop smoking, and that she at least should cut back for the surgery because smoking was not good for wound healing. He did not ask her to stop smoking for a specific period before surgery, nor did he tell her that she should not smoke after the surgery. Eight days before surgery, the Doctor received a FAX from a pulmonary physician who had examined the Patient and diagnosed possible pulmonary and cardiac problems. This prompted the Doctor to order a chest X-ray of the Patient, completed two days before her surgery.

The day before surgery, the Patient went through a pre-operation workup with nurses and the anesthesiologist. She revealed for the first time that she actually was smoking a pack of cigarettes a day, recently down from two packs a day. The Doctor saw the Pre–Anesthetic Evaluation an hour before surgery and was "shocked" to discover the true extent of Patient's smoking habit. He thus knew before surgery that her true level of smoking meant a significantly increased risk of improper healing after the surgery. He then looked at the Patient's chest X-ray and saw no sign of lung disease. He also checked the readout on her pulse oximeter, which showed 96–97 percent, a readout which

suggested, in his words, that the Patient was "not compromised" and was "a safe candidate for surgery." The Doctor did not talk with the Patient further about the correct level of risk associated with her smoking. Nor did he ask whether she wanted to postpone surgery or decide himself to postpone it. Rather, on the strength of the chest X-ray and the pulse oximeter reading he proceeded with the surgery under general anesthesia.

The day after the surgery, the Doctor visited the Patient in the hospital and noted that she was a smoker with diminished respiration. He ordered her placed on a forced-air machine to expand her lungs and increase her respiration. He also wrote an order to discharge the Patient the following morning. The Doctor did not tell the Patient not to smoke once at home.

During the Patient's first post-operative office visit, the Doctor observed no problem with the incision. He removed drains from the incision, advised the Patient on caring for it, and told her to return in ten days or earlier if the incision developed a problem or if she had any concern. The Doctor did not discuss the Patient's smoking habit with her during this visit.

At the second post-operative office visit, the Doctor noted that the Patient's incision had developed "ischemic" changes, and that it was breaking down and would need "debridement."[1] The Doctor filled out a treatment plan for the Patient to give to her visiting nurse, but the plan contained nothing about smoking. On this occasion, however, the Doctor did discuss the Patient's smoking and told her that he was "concerned" about it. The Doctor scheduled the debridement surgery and, a few days later, discussed the scheduled surgery with a visiting nurse. He did not tell the nurse that the Patient was not to smoke.

In the first debridement surgery, the Doctor removed necrotic fat tissue and reclosed the incision. This procedure risked the same improper healing that the original surgery had. In a post-operative visit, the Doctor explained to the Patient that if necrosis recurred, he would not be able to do another debridement to reclose the incision, because that would create more deformity. Instead, he would have to leave the incision open after debridement and close it later with a graft of skin taken from another part of her body. He did not discuss her smoking with her, however, or suggest that she should not smoke during recovery from surgery.

In a post-debridement office visit, the Doctor noted that Patient had additional fat necrosis and separation. He scheduled a second debridement surgery after which he left the incision open pending a skin graft, which was successful. The entire process left the Patient with two scars reflecting the original incision and the area from which the Doctor took the skin graft.

The Patient sued the Doctor for malpractice, alleging that he had failed to obtain her informed consent before surgery, and that he had been negligent in treating her. The Doctor denied lack of informed consent. He answered the negligent treatment claim by asserting that the Patient had been contributorily negligent in lying to him about her level of smoking and in continuing to smoke after the surgery. The Patient then countered that the Doctor had had the "last clear chance" to avoid her injury, and that she should be permitted, accordingly, to recover damages despite possible contributory negligence on her part.

---

1. "Ischemic" means a lack of blood supply to the area resulting in localized tissue anemia. "Debridement" is the surgical removal of lacerated, devitalized, or contaminated tissue.

## II.

After explaining to the jury both negligence and contributory negligence, the trial court gave a "last clear chance" instruction over the Doctor's objection. The court specified four elements a plaintiff must satisfy before a jury may award damages to a plaintiff found contributorily negligent. There must be evidence

(1) that the plaintiff was in a position of danger caused by the negligence of both the plaintiff and the defendant; (2) that the plaintiff was oblivious to the danger or unable to extricate herself from the position of danger; (3) that the defendant was aware, or by the exercise of reasonable care should have been aware, of the plaintiff's danger and of her obliviousness to it, or of her inability to extricate herself from it; and (4) that the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and of her inability to extricate herself from it, but failed to do so.[2]

The trial court then told the jury that if it found these four conditions were met, it could find for the Patient even though it found that her own prior negligence had contributed to her injury. In simpler language, the "last clear chance" instruction means that, after both plaintiff and defendant negligently have created a situation dangerous to plaintiff, the defendant can be held liable nonetheless, after plaintiff no longer can save the situation, if the defendant still could have protected plaintiff from harm (knowing plaintiff herself could not do so) but—*in a second negligent act or omission*—failed to do so. Liability based on the "last clear chance," therefore, means that although plaintiff's own actions canceled out defendant's first act of negligence, a jury reasonably could find that defendant's later negligence alone proximately caused plaintiff's injury.

Sometime during the morning of its second day of deliberations, the jury received a verdict form the court had structured to deal, fundamentally, with the issues of informed consent and negligent treatment. The first four questions apparently were addressed to the issue of informed consent but are not known to us because neither party submitted the verdict form as part of the record. The transcript does show, however, that in answer to the first question, the jury decided in the Doctor's favor—finding informed consent—whereupon the court then skipped questions two through four and took up the issue of negligent treatment, beginning with question five:

(5) Does the jury find that the defendant was negligent in providing treatment to the plaintiff and that his negligence proximately caused her injury? (if no, then stop)

(6) Does the jury find that the plaintiff was contributorily negligent in proximately causing her injury? (if no, go to 8; if yes, proceed to 7)

(7) Does the jury find that the defendant failed to take advantage of the last clear chance to avoid injury to the plaintiff?

(8) In what amount does the jury find for the plaintiff?

Unable to make a decision after receiving the trial judge's answers to their four notes about the meaning of "last clear chance," the jurors sent out two more notes saying they could not agree on this issue. Because the last note came quite late in the afternoon, however, the court

---

**2.** *See District of Columbia v. Huysman,* 650 A.2d 1323, 1326 (D.C.1994) (citing *Felton v.* *Wagner,* 512 A.2d 291, 296 (D.C.1986)).

sent the jurors home after asking them to reconvene the next day.

The following morning, the court gave the jury a *Winters* charge designed to press the jury to make a decision rather than abort the trial.[3] Later that day, the jury returned a verdict finding that the Doctor had obtained the Patient's informed consent to the surgery; that the Doctor had been negligent in treating the Patient and that his negligence had proximately caused her injury; that the Patient had been contributorily negligent in proximately causing her injury; but that the Doctor had failed to take advantage of a last clear chance to avoid injury to the Patient. The jury awarded damages of $465,000.

### III.

■ We cannot agree with the Doctor's contention that, on the facts here, a last clear chance instruction was impermissible. A jury reasonably could have found (1) that the Doctor at the initial appointment with the Patient had not adequately explained to her how dangerous smoking was for proper wound healing, had not sufficiently probed the extent of her smoking, and thus had not obtained the Patient's *informed* consent to the surgery; (2) that the Patient, in failing initially to tell the Doctor the truth about the extent of her smoking, had contributed to her injury; but (3) that the Doctor, after learning before surgery the full extent of the Patient's smoking habit—and then failing to discuss it with her before performing the surgery under anesthesia (when she

was oblivious to the danger)[4]—had had a second, unfettered opportunity to avoid the injury, and in failing to do so was liable for damages under the "last clear chance" doctrine.[5]

■ The jury here, however—according to analysis compelled by the structure of the verdict form—did not follow this line of reasoning. In answer to the first question on that form, the jury found that the Patient had given her "informed consent" to the surgery. Thereafter, the verdict form left no room for a finding of the first round of negligence (commonly called "antecedent negligence") necessary to trigger a finding that the Doctor had had a second, or "last clear" chance to prevent the Patient's injury. To the contrary, by finding that the Patient had given her informed consent to the first surgery—meaning that, *fully informed of the risks,* she had consented to everything the Doctor said and did before the Patient was under anesthesia and the doctor began to cut[6]—the jury inherently found that the Doctor, to that point, had not been negligent. In finding, next, that the Doctor had been negligent in "providing treatment," the jury thus had to mean negligence for the first time beginning no earlier than the first cut upon commencement of the surgery itself.

As the case was presented, however, the allegedly negligent "treatment" did not include the first cut, let alone the first surgery. Although the amended complaint claimed negligence not only from "failure to inform" but also from the Doctor's "fail-

3. *Winters v. United States,* 317 A.2d 530 (D.C. 1974).

4. *See Westbrook v. Washington Gas & Light Co.,* 748 A.2d 437, 441 (D.C.2000).

5. *See Washington Metro. Area Transit Auth. v. Young,* 731 A.2d 389, 395 (D.C.1999); *Robinson v. District of Columbia,* 580 A.2d 1255,

1258 (D.C.1990); *Felton v. Wagner,* 512 A.2d 291, 296–97 (D.C.1986); *WMATA v. Jones,* 443 A.2d 45, 51 (D.C.1982) (en banc); *Phillips v. D.C. Transit Sys.,* 198 A.2d 740, 741–42 (D.C.1964).

6. *See Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 557 (D.C.2001).

ure to postpone" the surgery—implying negligence in going forward with surgery regardless of the Patient's consent—the latter claim of negligence dropped out of the case before trial. The pretrial statement, as well as the Patient's closing argument to the jury, limited the negligence claims to (1) lack of informed consent, and (2) "deviat[ion] from reasonable medical care standards in treating [the] surgical wound infection." The jury thus never considered whether the Doctor, irrespective of the Patient's informed consent, might have been negligent in going forward with the first surgery once fully informed of the Patient's heavy smoking habit. The jury's last clear chance finding thus focused, exclusively, on the period *after* the first surgery.

The jury's finding of negligent treatment, of course, could have resulted in the Doctor's liability. But, according to the verdict form, after the jury found negligent "treatment" by the Doctor—necessarily meaning negligent treatment of the surgical wound infection—the jury found the Patient "contributorily negligent in proximately causing her injury," presumably based on the Patient's continued smoking. That finding barred recovery as a matter of law. At that point, the seventh question on the jury form—"Does the jury find that the defendant failed to take advantage of the last clear chance to avoid injury to the plaintiff"?—had become meaningless, since the "treatment" issue was presented as competing claims of negligence and contributory negligence during the same time period, not as a sequence of legally separate elements that could yield "antecedent," followed by actionable, negligence.

In short, a "last clear chance" finding was unavailable as a matter of law on this record once the jury had found informed consent for the initial surgery. In the absence of any other negligence issue prior to the wholly-separate wound-healing issue, the verdict form should have permitted the jury to consider "last clear chance" only if it first found no informed consent, then contributory negligence. On this record, "last clear chance" had no place in the wound-healing treatment analysis.

## IV.

█ The Patient asks us nonetheless, despite the jury's informed consent finding, to find "antecedent negligence" in the Doctor's alleged failure, first, to take an adequate medical history, followed by his wholly separate, negligent decision to go forward with the surgery once he had become aware of the Patient's true smoking habit. The first of these alleged defaults, however, unquestionably is embraced within the scope of pre-surgical "informed consent," not within the later period of "treatment." On the record here, the jury could have found that the Doctor's warning that smoking deterred wound-healing, when coupled with the Patient's knowledge of her serious smoking habit, left her sufficiently informed of the risk involved to give legally effective consent to surgery.

The second alleged default reflects an effort to cure on appeal an omission at trial. The jury, as we have seen, was not asked to find negligence in the doctor's decision to go forward without regard to informed consent. If the Patient had pursued that issue—arguing that the Doctor should not have proceeded once he was fully informed about the Patient's smoking and could have aborted the surgery while the Patient was helpless under anesthesia—then, but only then, the last clear chance instruction would have fit.

█ The Patient also maintains that, as a matter of law on this record, given her eventual admission of her true smoking habit, the jury could not reasonably have found that her contributory negligence, in

lying initially about her smoking, was the proximate cause of her injury. Consequently, she says, because the jury found that the Doctor's negligent treatment proximately caused her injury, that finding—absent a contributory negligence bar—should permit the verdict to stand, since any misapplication of the last clear chance doctrine was harmless. We cannot agree, if only because the record, fairly read, does not preclude a jury finding that the Patient's own negligence was a continuing, proximate cause of her injury. The injury here was derived not only from the first surgery but also from the two, later debridement surgeries. There is ample record evidence that the Patient continued to smoke while she recovered from the first surgery during the period of the additional, debridement surgeries. Expert testimony confirmed that the Patient's smoking after the first surgery slowed her healing. The jury reasonably could have seen her continued smoking—with knowledge that the Doctor had warned against it from the beginning, however casually, and cautioned her again during the second post-operative visit—as contributory negligence that concurrently, and thus proximately, caused her injury.

\*    \*    \*    \*    \*    \*

In sum, on this record, a last clear chance finding would be relevant, and thus valid, only after findings of no informed consent and contributory negligence, since the Patient did not argue, in addition, that the Doctor had been negligent in performing the first surgery without regard to informed consent. Because, however, the special verdict form permitted the jury to make a last clear chance finding despite a finding of informed consent—and thus allowed the jury to consider last clear chance after finding negligent wound-treatment without a finding of antecedent negligence—we must reverse. The question then becomes whether to reverse and remand for a new trial or to reverse out-

right, ordering judgment for the defendant Doctor.

■ We choose the latter, When counsel for the Patient requested a last clear chance instruction over the Doctor's objection, Patient's counsel did not object to lodging that instruction in the negligent treatment section of the verdict form, where it did not belong, rather than asking for insertion of the instruction in the informed consent section of the form, where it did belong. As a result, the Patient must be said to have waived any last clear chance instruction for the informed-consent/first-surgery phase of the case. The Patient thus benefitted erroneously from an unwarranted placement of the last clear chance instruction. She would not have benefitted if the instruction had been lodged properly, since the jury found for the Doctor on informed consent before a last clear chance instruction would have been triggered.

■ We have considered whether, nonetheless, a new trial should be awarded on the negligent treatment phase of the case on the ground that the erroneous availability of the last clear chance instruction, as a basis for finding against the Doctor, may have caused the jury to find too cavalierly the Patient's own contributory negligence during the post-operative/debridement surgery phase. That theoretical reconstruction of the jury's collective thought process, however, is too speculative to find persuasive. Nothing in the trial of the treatment phase suggested that the Patient had any basis for inferring less danger from smoking after the initial surgery than before it, especially given the Doctor's warning during the second post-operative visit. It is just as likely, if not more so, that the jury's use of last clear chance was an analysis of comparative fault indicating that the jury found the Doctor more negligent than the Patient was. But this

jurisdiction does not recognize comparative negligence analysis. Judgment, therefore, must be entered for the defendant Doctor.

*So ordered.*

REID, Associate Judge, concurring in part and dissenting in part.

I join Judge Ferren's opinion fully except for the last paragraph which enters judgment for the defendant doctor. I believe that the case should be remanded for a new trial, given the confusion attending the jury's deliberations, as evidenced by the fact that after receiving the jury verdict form on the second day of its deliberations, the jury sent four notes to the judge with questions about the doctrine of last clear chance. Subsequently, the jury sent two more notes to the judge, which still expressed confusion and an inability to come to an agreement. Only after receiving the *Winters* instruction did the jury reach a verdict. Under these circumstances, I would not speculate as to how the jurors would have resolved the informed consent issue had they been instructed properly and had they received a verdict form at the beginning of their deliberations. Consequently, I would reverse and remand the case for a new trial.

Separate Statement by Senior Judge FERREN, joined by Associate Judge REID.

The facts as they unfold here, the jury's understandable confusion, and the complicated legal analysis applicable at trial and on appeal, demonstrate why this jurisdiction should adopt the doctrine of "comparative negligence" under which plaintiff and defendant, when both are negligent, assume financial responsibility for the plaintiff's injury in proportion to the respective fault of each. *See District of Columbia v. Huysman,* 650 A.2d 1323, 1327 (D.C.1994) (Ferren, J., concurring); *id.* at 1328 (Farrell, J., concurring); *WMATA v. Jones,*

443 A.2d 45, 53 (D.C.1982) (Ferren, J., joined by Newman, C.J., concurring). Presently, when both plaintiff and defendant are negligent, District of Columbia courts must apply the awkward—and almost universally-discarded—doctrine barring a plaintiff's recovery entirely because of the plaintiff's "contributory negligence," unless the plaintiff can prove that the defendant, concurrently negligent with the plaintiff, later had a second, "last clear chance" to avoid the injury (when the plaintiff could not do so) and failed to take it. The defendant is then held to pay for the injury 100 percent despite the plaintiff's own negligence that contributed, in part, to her harm. Preferable to this either-or analysis would be the jury's assessment of proportional fault as the basis for any recovery, as most jurisdictions by now have recognized.

SCHWELB, Associate Judge, concurring.

The question whether we should direct entry of judgment in favor of the doctor, as Judge Ferren argues, or order a new trial, as Judge Reid suggests, is a close and difficult one. On balance, I agree with Judge Ferren and join his main opinion, which thus becomes the opinion of the court.

I write separately, however, because I cannot agree with the "Separate Statement" issued by my colleagues—a majority of the division. In that "Separate Statement," the majority uses this case, which has not heretofore featured any issue of comparative negligence, as a vehicle for advocating a very significant change in the law of torts in the District of Columbia. It may or may not be in the interests of justice to abandon this jurisdiction's longstanding rule that contributory negligence generally bars recovery. If a change is desirable, then the obvious question arises

whether such a radical departure from our well-entrenched substantive law should be effected by the court or by the legislature. The nettle that my colleagues have grasped implicates sophisticated and difficult questions of judicial and legislative policy. It is not consistent with conventional judicial norms, in my opinion, for judges to volunteer their personal policy preferences on this controversial subject when the issues before the court are entirely different.

Until today, this case has been solely about the applicability to the record before us of the doctrine of "last clear chance." Neither party has raised, in the trial court or on appeal, the question whether this court should adopt a "comparative negligence" approach. Because the issue was not raised, it has not been briefed. The trial judge has had nothing to say about it. In my own case, I acknowledge that I am undecided regarding whether this court should overrule its contributory negligence precedents. Although it has been almost half a century since I entered law school in 1953, I have never seen or heard the point systematically debated in a court of law, with authorities on both sides of the issue set forth in written submissions, and with the court having the opportunity to question counsel at oral argument. If we were to decide to replace the contributory negligence rule without a legislative enactment, we should do so in the orderly manner described above, and we should not volunteer conclusions until arguments for each point of view have been presented to us.

As in *Allen v. United States*, 603 A.2d 1219, 1228–29 n. 20 (D.C.1992) (en banc), I "do not think that this is an appropriate occasion to provide unsolicited guidance to the trial court [or to anyone else] on an issue different from the one which the parties briefed and which we [have been called upon] to decide." My colleagues' views as to whether or not the doctrine of

comparative negligence should be adopted "have not been tested by the fires of adversary presentation." *Id.* at 1229 n. 20 (quoting *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir.1988)) (internal quotation marks omitted). Moreover, my colleagues' "Separate Statement" has no effect whatever on the outcome of this case; their opinion is purely advisory. It is beyond the authority of a trial court, *Smith v. Smith*, 310 A.2d 229, 231 (D.C.1973), or of an appellate court, *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174 (D.C. 1993), "to issue advisory opinions regarding questions which may or may not arise." *Id.* at 182. "Courts should not decide more than the occasion demands," *id.* (citation omitted), and,

> [a]s a general rule, this court will decide only such questions as are necessary for a determination of the case presented for consideration, and will not render decisions in advance of such necessity.

*Id.* (quoting *Johnson v. Morris*, 87 Wash.2d 922, 557 P.2d 1299, 1305 (1976) (en banc)).

To be sure, my colleagues are not "deciding" whether we should adopt comparative negligence principles, because only the en banc court could do that. *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). Nevertheless, they are volunteering views which go far beyond the case before us, and they are doing so without an adversarial crossing of swords on the issue. I believe that doing so is contrary to prudent canons of judicial restraint.

Finally, I raise a delicate matter which each judge must determine for himself or herself. If I were to volunteer views on an issue of this kind in a case in which that issue has not been presented or argued, I would apprehend that, if the issue did arise in the normal course in some future case, it would be difficult to avoid the appearance of having pre-judged that case without first having heard the parties' argu-

ments. My two colleagues, both of whom I hold in very high esteem, may not share that concern, and I respect their views on the matter. Nevertheless, appearances count, and I cannot help thinking that the appearance of impartiality and of openness to persuasion is compromised when definitive views are announced, as they have been here, without prior briefing or argument. For this reason also, I think it unwise to volunteer the kind of advisory opinion that a majority of the division issues today.