*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CM-130

WINSTON PEREZ HERNANDEZ, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2014-CMD-013406)

(Hon. Patricia A. Wynn, Trial Judge)

(Argued December 17, 2019                      December 29, 2022)

*Alice Wang*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellant.

*Chrisellen R. Kolb*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, *Elizabeth Trosman*, and *John P. Mannarino*, Assistant United States Attorneys, were on the brief, for appellee.

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General at the time the brief was filed, *Rosalyn Calbert Groce*, Deputy Solicitor General, and *John D. Martorana*, Assistant Attorney General, filed a brief for amicus curiae, the District of Columbia, in support of appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, BECKWITH, EASTERLY, MCLEESE, HOWARD, and SHANKER, *Associate Judge*s,* and FISHER, *Senior Judge*.**

Opinion for the court by *Senior Judge* FISHER.

Opinion by *Chief Judge* BLACKBURNE-RIGSBY, with whom *Associate Judge* SHANKER joins, concurring in part, at page 38.

Opinion by *Associate Judge* EASTERLY, concurring *dubitante*, at page 39.

FISHER, *Senior Judge*:  Over the last century, this court and its predecessors have tried many times, with mixed success, to define the common law crime of assault; some of the things we have said are difficult to reconcile.  This case, which began with allegations that appellant had committed an assault with a beer bottle but morphed into something quite different, presents a fresh challenge.  We must decide whether an offensive touching, performed with minimal force and not of a sexual nature, may be a criminal assault.  We conclude that it may.

---

\* Associate Judges Deahl and AliKhan did not participate in the consideration or decision of this appeal.

Judge Glickman and Judge Thompson were Associate Judges of the court at the time of oral argument.  Judge Thompson began her service as a Senior Judge on February 17, 2022; Judge Glickman began his service as a Senior Judge on December 21, 2022.  Because they were not members of the division that decided the case, they no longer are members of the en banc court.  D.C. Code § 11-705(d); Internal Operating Procedures § XI(C).

\*\* Judge Fisher was an Associate Judge of the court at the time of oral argument.  His status changed to Senior Judge on August 23, 2020.  Because he was a member of the division that decided the case, he may sit as a judge of the court en banc.  *Id*.

# I.    Statement of Facts

## A.  The Altercation on July 8, 2014

On July 8, 2014, a group of men — including appellant — gathered at the apartment of Alimamy Tarawallie to watch a World Cup soccer game.  After the game, the group moved outside; someone went to a nearby store and returned with a large bottle of Guinness.  While drinking beer from the bottle, appellant approached Mr. Tarawallie and began to speak with him.  Mr. Tarawallie testified that appellant "used to be my friend, in fact, I think [of] him as my little brother."

Mr. Tarawallie explained that appellant "came and the bottle was spilling, you know, from the bag they put it [in].  Then he came, he was talking to me and touching me at the same time.  I told Mr. Winston [referring to appellant by his first name] not to touch me while he's talking to me.  You know because it's almost — by touching me the smell will stay on my attires."  Appellant seemed to be offended and suggested that the request was racially motivated.  Mr. Tarawallie replied that "it's nothing about color.  You're black, me black.  I told you to stop touching me if you talk.  Just talk and I'll listen to you."  Mr. Tarawallie also

appealed to some of the other men: "I told them to tell Mr. Winston to stop touching me when he's talking."

In the meantime, appellant stepped away and spoke to his friend Oscar in Spanish, a language Mr. Tarawallie did not understand. Appellant then walked back and demanded to know, "If I touch you, what you going to do [to] me?" Mr. Tarawallie answered, "if you touch me, I'll push you."[1] He testified (and demonstrated) that, in response, appellant placed "his finger [or fingers] on my face, . . . right in my eyes, like this." Mr. Tarawallie reacted by pushing appellant, who then took the Guinness bottle he was holding and "smashed it . . . on [Mr. Tarawallie's] head." Both men ended up in a tussle on the ground, during which appellant banged Mr. Tarawallie's head against the sidewalk. Appellant then "ran away" and Mr. Tarawallie called 911. Officer William Schoppmann and Detective Ryan Savoy responded to the call.

The witnesses who remained on the scene were not cooperative. Officer Schoppmann testified about the location of the beer bottle (found on the grass, some distance away from where they were interviewing Mr. Tarawallie) and about

---

[1] Mr. Tarawallie acknowledged that he said "I'll punch you" when recounting the events in his 911 call. He maintained, however, that he in fact warned appellant, "I'll push you."

Mr. Tarawallie's visible injuries. Detective Savoy obtained a warrant to arrest appellant, who turned himself in and agreed to talk about the fight. Appellant claimed that he had acted in self-defense. He said "that he had touched [Mr. Tarawallie] on the arm, and [that Mr. Tarawallie] had attacked him." Appellant also said that Mr. Tarawallie "had made some kind of mention that he was going to assault [appellant] if he touched him again." Appellant "said that he touched [Mr. Tarawallie] on the arm again, and that's when [Mr. Tarawallie] attacked him."

During the bench trial, Mr. Serrano Baez — who attended the gathering and saw part of the altercation — testified that Mr. Tarawallie was upset by the outcome of the soccer game and that, after they moved outside, appellant repeatedly mentioned the loss, telling Mr. Tarawallie that he should not feel bad because he had not lost any money. Mr. Baez heard Mr. Tarawallie warn appellant "don't touch my arm or you're going to see what is going to happen to you." Mr. Baez explained that appellant did touch Mr. Tarawallie again, at which point Mr. Tarawallie "reacted violently and . . . punched" appellant. Mr. Baez testified that the men ended up in a scuffle on the ground during which Mr. Tarawallie's head hit the pavement. In Mr. Baez's estimation, Mr. Tarawallie "was the one who attacked first." Appellant did not testify.

## B.  The Trial Court's Factual Findings

In his closing argument, defense counsel attacked Mr. Tarawallie's credibility, asserting that he "made up" the blow with the beer bottle in an effort to explain how he sustained injuries.  Counsel offered a different explanation.  "Mr. Perez Hernandez was being playful, was being jocular and kind of pushing."  When appellant touched him again, Mr. Tarawallie "escalat[ed] it into an actual fisticuffs fight."  But that was an overreaction.  "A touch, itself, did not warrant that, . . . it was not an offensive touch in and of itself based on their prior history together as friends . . . ."  Perhaps appellant exercised bad judgment.  "Was it an assault?  No."

During rebuttal, the prosecutor responded that "[t]he touch by Mr. Perez Hernandez is not why we are here.  That isn't assault, it's an unwanted touching."  The government urged the court to find that appellant assaulted Mr. Tarawallie when he struck him with a beer bottle.  After questioning from Judge Wynn, however, the government asserted that the touching of Mr. Tarawallie (at least the second touching) was an assault.  "[A]n unwanted touching is standard textbook assault."  Following further discussion, the court said it would look at the cases

more carefully and deferred its findings for approximately two weeks. In the interim, both parties submitted memoranda addressing the elements of an "offensive touching" assault.

Ultimately, Judge Wynn was not persuaded "beyond a reasonable doubt that the defendant hit the complaining witness with a bottle" or that "the defendant poked the complaining witness in the eyes." The court did find, however, that appellant "poked" Mr. Tarawallie "somewhere in his body" despite being admonished not to do so. The court also found "that the parties were at least acquaintances and maybe could even be described as friends."

The trial court reasoned that "a poke" would not usually result in an assault charge. "I think if we had one poke that it would not meet the requirements of something that would be objectively offensive to a person of reasonable sensibility . . . ." However, a second poke following a warning was different. "[N]ot only does that indicate that this person objectively [sic] finds the poking offensive, but also that objectively a person reasonably would find that intentional contact after the warning to be objectionable and offensive." Regarding the element of intent, the trial judge explained, "I think that there has to be an intent to do the touching, but there does not have to be an intent to be offensive. It's simply

a question of whether the person who is being touched, whether that person is reasonable in finding the touching to be offensive." The court then found appellant guilty of simple assault in violation of D.C. Code § 22-404(a)(1). It found him not guilty of attempted possession of a prohibited weapon (a glass bottle). *See* D.C. Code §§ 22-4514(b), -1803.

## C. The Appeal

On appeal, the division majority concluded that the evidence was legally insufficient to sustain appellant's conviction for simple assault under an attempted battery theory. The government had proven no more than an unwanted touching, but "there must be proof that the defendant acted with 'force or violence.'" *Perez Hernandez v. United States*, 207 A.3d 594, 601 (D.C. 2019). "A touch is inherently neither 'forceful' nor 'violent' within the common understanding (or even legal understanding) of those terms." *Id*. at 600 (footnote omitted). Nor did appellant's conduct fit within the category of cases treating a nonviolent sexual touching as an assault. *Id*. at 602 n.17.

The court decided to rehear the appeal en banc, and the opinions of the division were vacated. *See Perez Hernandez v. United States*, (D.C. 2019).

Following supplemental briefing and oral argument before the court sitting en banc, we now hold that the evidence was sufficient to support a conviction for assault but remand for the trial court to make additional findings in light of this opinion.

## II.     Legal Analysis

With ample justification, a distinguished jurist from Maryland has cautioned that "[c]ommon law assault . . . is a chameleon concept that no one should attempt to describe too precisely.  It takes on different colorations in different factual settings." *Lamb v. State*, 613 A.2d 402, 411 (Md. Ct. Spec. App. 1992) (opinion for the court by Moylan, J.).  Duly cautioned, and informed by our own experience, we forswear any effort to articulate a new definition that encompasses all types of assault.  We focus instead, in the common law tradition, on deciding the case before us.  *See Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789, 812 (D.C. 2011) (en banc) ("The development of common law proceeds on a case-by-case incremental basis, and it is on that solid factual ground that judicial opinions build on a framework for analysis based on certain general precepts.").

## A.  The Statute

Our statute prohibiting simple assault provides that "[w]hoever unlawfully assaults, or threatens another in a menacing manner, shall be fined not more than the amount set forth in § 22-3571.01 or be imprisoned not more than 180 days, or both."  D.C. Code § 22-404(a)(1).  Other than the words authorizing penalties, this language has not been changed since the statute was enacted in 1901.  *See Ray v. United States*, 575 A.2d 1196, 1198 (D.C. 1990).  The statute itself does not set forth the elements of the crime, but we have long construed it to prohibit common law assault.  *See Alfaro v. United States*, 859 A.2d 149, 156 (D.C. 2004); *Mungo v. United States*, 772 A.2d 240, 245 (D.C. 2001); *Beausoliel v. United States*, 107 F.2d 292, 295 (D.C. Cir. 1939) ("common law assault, which is defined in various ways").

## B.  Our Authority

In 1901 "Congress codified the law of the District of Columbia" and, in doing so, recognized that "[t]he common law of the District of Columbia encompasses all common law in force in Maryland in 1801, unless expressly

repeated or modified." *United States v. Jackson*, 528 A.2d 1211, 1215 (D.C. 1987); *see* D.C. Code § 45-401.[2] Maryland's common law in 1801 incorporated in turn English common law, as "[i]n 1776, Maryland adopted the common law as it then existed in England." *Perkins v. United States*, 446 A.2d 19, 23 (D.C. 1982).

While we will focus much of our inquiry on common law understandings, that decisional law was neither uniform nor static, but differed from place to place and evolved as courts faced new factual scenarios. We emphasize, in addition, that "when the Maryland common law was incorporated into this jurisdiction, it was 'not a bar to the exercise of our inherent power to alter or amend the common law.'" *Ashby v. United States*, 199 A.3d 634, 665 (D.C. 2019) (quoting *Williams v. United States*, 569 A.2d 97, 100 (D.C. 1989)). "This court . . . has repeatedly rejected the view that the common law of the District of Columbia was 'frozen' in

---

[2] D.C. Code § 45-401(a) states that "[t]he common law, all British statutes in force in Maryland on February 27, 1801, the principles of equity and admiralty, all general acts of Congress not locally inapplicable in the District of Columbia, and all acts of Congress by their terms applicable to the District of Columbia and to other places under the jurisdiction of the United States, in force in the District of Columbia on March 3, 1901, shall remain in force except insofar as the same are inconsistent with, or are replaced by, some provision of the 1901 Code."

1901." *Fleming v. United States*, 224 A.3d 213, 228 (D.C. 2020) (en banc) (citing cases).[3]

We cannot, of course, create new crimes, and we are not doing so. Congress codified the crime of assault in 1901, and, as explained above, we have long construed the statute to prohibit the common law offense of assault. "The parties agree that common-law simple assault encompasses 'even the slightest offensive touching.'" Reply Brief for Appellant at 3 (quoting *Johnson v. United States*, 559 U.S. 133, 139 (2010)). Here, as in *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc), we exercise our authority to clarify the elements of a crime created by the legislature. *See id.* at 319-20 n.12.[4]

---

[3] In addition, this court, when sitting en banc, "may overrule the decisions of prior divisions." *McCamey v. District of Columbia Dep't of Emp. Servs*, 1196 (D.C. 2008) (en banc). This power of the en banc court to change the law extends "to decisions of the United States Court of Appeals rendered prior to February 1, 1971," which, "like the decisions of this court, constitute the case law of the District of Columbia." *M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

[4] We do not question the ability of the legislature to change the common law. As Judge Easterly points out in her separate opinion, the Council of the District of Columbia recently has passed a wholesale revision of the criminal code. Assuming that legislation becomes law, it will not take effect for some years, and it obviously will not apply retroactively. In the meantime, we must decide appellant's appeal under the current law, and this decision also may impact numerous other appeals which have been held in abeyance pending this en banc decision.

## C. There Are Various Forms of Assault

"[I]n the early law a criminal assault was an attempt to commit a battery and that only." Rollin M. Perkins, *An Analysis of Assault and Attempts to Assault*, 47 Minn. L. Rev. 71, 72 (1962). Foundational case law in the District of Columbia defined common law assault as "an attempt with force or violence to do a corporal injury to another; and may consist of any act tending to such corporal injury, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Patterson v. Pillans*, 43 App. D.C. 505, 506–07 (D.C. Cir. 1915). Although *Patterson* was a civil case, this definition of assault has also been used in criminal cases. *See Guarro v. United States*, 237 F.2d 578, 580 (D.C. Cir. 1956) (quoting *Patterson*). Indeed, the *Patterson* court adopted the definition, which it characterized as "comprehensive," from a criminal case. *See Hays v. People*, 1 Hill 351 (N.Y. Sup.Ct. 1841).[5] Over time, the concept of a criminal assault has evolved to incorporate principles from the law of torts.[6]

---

[5] Neither *Patterson* nor *Hays* involved facts comparable to those presented here. In *Patterson*, the "mistress of the house" had locked her "maid servant" in a room. The maid sued to recover damages for assault, but the court held that she had failed to state a cause of action. No threats had been made, and "[t]he mere

(continued…)

More recently we have endorsed the following formulation:

> The three elements of assault are: (1) an act on the part of the accused (which need not result in injury); (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the act is committed. . . . The intent element requires a general intent to perform the act, rather than specific intent. . . . The assailant, therefore, need not [have] a conscious purpose to inflict injury.

*Mobley v. United States*, 101 A.3d 406, 419 n.10 (D.C. 2014) (quoting or citing

*Ruffin v. United States*, 642 A.2d 1288, 1295 (D.C. 1994); *Smith v. United States*,

---

(…continued)

locking or obstruction of a door is not an assault." 43 App. D.C. at 507. In *Hays*, the defendant had lured "a female under ten years of age into a building for the purpose of ravishing her." 1 Hill at 351. He exposed himself, but there was no evidence that he had actually touched her. Nevertheless, the court upheld the conviction for assault with intent to commit a rape. *Id*. at 353.

[6] "Despite historical distinctions, certain aspects of the concepts of a criminal assault and the tort of assault have merged, enlarging the criminal concept to encompass such conduct as could induce in the victim a well-founded apprehension of peril." *Anthony v. United States*, 361 A.2d 202, 204 (D.C. 1976). *See also Lamb v. State*, 613 A.2d 402, 411 (Md. Ct. Spec. App. 1992) ("Maryland, early on, included this tort concept of assault as part of its common law crime of assault.") (citing *Handy v. Johnson*, 5 Md. 450, 465 (1854)); Rollin M. Perkins, *An Analysis of Assault and Attempts to Assault*, 47 Minn. L. Rev. 71, 80 (1962) ("[I]n most states the criminal law concept of assault has been enlarged by the addition of the tort theory . . . .").

593 A.2d 205, 207 (D.C. 1991); and *Sousa v. United States*, 400 A.2d 1036, 1044 (D.C. 1979)).

Even oft-repeated definitions have proven to be imprecise, however. Although we have defined assault as "an attempt with force or violence to do a corporal injury to another[,]" *Patterson*, 43 App. D.C. at 506, "'violence' in its ordinary meaning is not a necessary element of assault." *Harris v. United States*, 201 A.2d 532, 534 (D.C. 1964) ("the jostling of [the victim by a pickpocket robber], the fumbling with his trouser cuffs, and the impact at the area of his hip pocket constituted sufficient evidence" of assault). And no physical injury need have resulted. *Dunn v. United States*, 976 A.2d 217, 222 (D.C. 2009) ("[U]nder our established law, Dunn's shove was an assault even if it did not cause Agneu any physical harm.").

Our assault statute also forbids "threaten[ing] another in a menacing manner." D.C. Code § 22-404(a)(1). We thus have often said that criminal assaults fall into "two distinct" categories: attempted battery assaults and intent-to-frighten assaults. *See*, *e.g.*, *Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986). An attempted battery assault is the "more common" of the two, *id.*, and Mr. Perez Hernandez was convicted on the theory that he attempted (indeed,

completed) a battery.  As intent-to-frighten assault is not at issue in this appeal, we will not address it further.  *See District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) ("We . . . confine ourselves to a resolution of the only question fairly presented to us by this appeal . . . .").

Our precedent also recognizes that "non-violent actions involving sexual misconduct may constitute assaults." *Guarro*, 237 F.2d at 580.[7]  We have referred to "non-violent sexual touching assault as a distinct type of assault," *Mungo*, 772 A.2d at 245, but an offensive sexual touching might be more accurately described as a battery, prosecutable in this jurisdiction as an assault.  See Brief for Appellant at 10 n.7 (non-violent sexual touching "was considered a battery at common law").

---

[7] In *Beausoleil v. United States*, 107 F.2d 292, 293 (D.C. Cir. 1939), the District of Columbia Circuit affirmed a conviction for violating our assault statute where the appellant — without force or violence (as those terms are commonly understood) — engaged in sexual touching with a six-year-old child.  The court reasoned that although the conduct did not present the same "threat or danger of physical suffering or injury" as the two categories of assault described above, it was nevertheless an assault because the touching may cause the victim "fear, shame, humiliation, and mental anguish." *Id*. at 296-97.  *See also Guarro*, 237 F.2d at 580-81 ("Unless there is consent, it would seem that a sexual touching is a sufficiently offensive act to constitute an assault."); *In re A.B.*, 556 A.2d 645 (D.C. 1989) (defendant "grabbed and squeezed A.E.'s buttocks on a public street").  This type of assault is commonly known as an "offensive sexual touching." *See Contreras v. United States*, 121 A.3d 1271, 1274 (D.C. 2015); *Alfaro v. United States*, 859 A.2d 149, 156 (D.C. 2004).

The question presented in this case is whether a nonviolent offensive touching, not of a sexual nature, also constitutes an assault.

We have said that it does, and we have held that it does. *See Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (the crime of simple assault "is designed to protect not only against physical *injury*, but against all forms of offensive touching"); *Dunn*, 976 A.2d at 211 (conviction for assault affirmed because shove by defendant was offensive to victim); *Ray*, 575 A.2d at 1199 (spitting on someone is an assault because it is "highly offensive"). These and other rulings recognize that such touchings not only offend a person's reasonable sense of personal dignity, but also may trigger a breach of the peace, as happened here. These cases also are consistent with the common law understanding of battery, "which held th[e] element of 'force' to be satisfied by even the slightest offensive touching." *Johnson v. United States*, 559 U.S. 133, 139 (2010); *see also id*. at 146 (Alito, J., dissenting) ("The term 'force,' as the Court correctly notes, had a well-established meaning at common law that included even the 'slightest offensive touching.'"); *accord*, *United States v. Castleman*, 572 U.S. 157, 162 (2014) (referring to "the common-law meaning of 'force'— namely, offensive touching").

## D. Battery Is An Assault

The District of Columbia does not have a separate statute criminalizing the common law offense of battery. This omission apparently has had little or no practical effect, but it undoubtedly has led to difficulty in defining the offense of assault. "Experience reflects that th[e] offense [of assault] is most often charged in circumstances involving violent behavior." *Mungo*, 772 A.2d at 245. In other words, completed batteries have been routinely prosecuted as assaults.[8] In *Ray v. United States*, 575 A.2d 1196 (D.C. 1990), and again in *Mahaise v. United States*, 722 A.2d 29 (D.C. 1998), we explained that it makes no legal difference whether the facts underlying a conviction for assault show "not just an attempted battery but a completed battery." *Ray*, 575 A.2d at 1199; *see also Mahaise*, 722 A.2d at

---

[8] *See, e.g.*, *Contreras v. United States*, 121 A.3d 1271, 1275 n.1 (D.C. 2015) (slap in the face, a completed battery, was prosecuted as an assault); *Delaney v. United States*, 190 A.2d 100, 102 (D.C. 1963) (sustaining appellant's conviction for assault where there was evidence that he "inflicted a vicious and deliberate beating on the complaining witness"); *Ingram v. United States*, 110 A.2d 693, 694 (D.C. 1955) (there was sufficient evidence that appellants committed simple assault when they "forcibly carr[ied] [the victim] to the upper floor," choked her, and "forcibly remov[ed] some of her clothes"); *Mostyn v. United States*, 64 F.2d 145, 145 (D.C. Cir. 1933) (police officers prosecuted for simple assault where the evidence showed they "beat[] [the victim] with the[ir] hands"); *Landrum v. United States*, 63 F.2d 990, 990-991 (D.C. Cir. 1933) (police officer convicted of simple assault based on testimony that he struck the victim).

30.[9]  "'[P]roof of a battery will support [a] conviction of assault.'"  *Ray*, 575 A.2d at 1199-1200 (quoting *United States v. Dupree*, 544 F.2d 1050, 1052 (9th Cir. 1976)).

### E.  The Positions of the Parties

In response to our request for supplemental briefing, the parties have addressed the elements required to prove simple assault in this type of case.  "The parties agree that common-law simple assault encompasses 'even the slightest offensive touching,'" Reply Brief for Appellant at 3 (quoting *Johnson*, 559 U.S. at 139), "'even though it causes or threatens no actual physical harm to the victim.'"  *Id.* (quoting *Ray*, 575 A.2d at 1199).

Moreover, both parties urge us to employ the mental states of knowledge and purpose used in the Model Penal Code.[10]  At this point, the harmony ends.

---

[9] However, *Mahaise* went too far when it stated that "[a] battery is any unconsented touching of another person."  722 A.2d at 30.  As we explain in more detail below, a defendant must have acted purposely (or, perhaps, recklessly), with a culpable state of mind.

[10] The Model Penal Code provides that (except for strict liability offenses) "a person is not guilty of an offense unless he acted purposely, knowingly, recklessly

(continued…)

The government asserts that assault, historically described as a "general intent" crime, is properly proved by showing "that a defendant engaged in assaultive conduct purposely, knowingly, or recklessly (but not merely negligently)."[11] Appellant agrees that we should use the concepts of purpose and knowledge, but he would apply them differently. He rejects "the conclusion that mere recklessness suffices to satisfy the intent element of simple assault."

Appellant Perez Hernandez argues that "a subjective intent to injure is an essential element of attempted-battery assault," meaning that it is necessary to have "an intent to harm or offend, and not merely 'an intent to do the touching.'" He advocates an objective standard of offensiveness: "[t]o qualify as 'offensive,' . . . a touching must be not only unwanted, but offensive to a person of reasonable sensibility . . . under the surrounding circumstances." Thus, appellant asserts, "to constitute a simple assault, an unwanted touching must be both *objectively* and *intentionally* offensive." The government agrees that, "as a general matter, the test is what would be offensive to an ordinary person not unduly sensitive as to

---

(…continued)
or negligently, as the law may require, with respect to each material element of the offense." Model Penal Code § 2.02(1).

[11] Appearing as *amicus*, the District of Columbia supports this statement of the elements of simple assault.

personal dignity," but argues that "a touching is also offensive where the defendant has special reason to believe that more or less will be permitted by the individual [he touches]."

Some of the disagreement between the parties undoubtedly is produced by the difficulty inherent in rephrasing the familiar (but elusive) terms "specific intent" and "general intent" to satisfy the modern preference for the mental states employed in the Model Penal Code. Further divergence stems from disagreement about what the elements of simple assault are, or should be. Our goal in this case will be to adapt and to clarify, not to forsake our pertinent common law rulings.

### F. Making The Linguistic Transition

We historically have categorized an attempted battery (or completed battery) assault as a "general intent" crime, meaning that the government must prove that "a defendant intended to do the acts which constitute the assault." *Smith v. United States*, 593 A.2d 205, 207 (D.C. 1991). *See also Lewis v. United States*, 938 A.2d 771, 783 (D.C. 2007) ("[t]o convict someone of assault under D.C. Code § 22–404 (2001), the government must prove . . . the intent to do the act that constituted the assault"). There need not be a "specific intent" to cause injury. *See, e.g., Lee v.*

*United States*, 831 A.2d 378, 380 (D.C. 2003) (government proved completed battery; "because assault is a general intent crime, there need be no subjective intention to bring about an injury") (internal quotation marks omitted); *see also State v. Duckett*, 510 A.2d 253, 257 (Md. 1986) ("Although intent is an element of the crime of battery, the intent need only be for the touching itself; there is no requirement of intent to cause a specific injury.").[12]

We recognize, however, that the historical categories of general intent crimes and specific intent crimes have been subject to much criticism. *See, e.g., United States v. Bailey*, 444 U.S. 394, 403 (1980) (the "venerable distinction" in the common law between general intent and specific intent has been "the source of a good deal of confusion"). While sitting en banc in 2017, we voiced our "concern about the use of 'general' and 'specific' intent" in lieu of "more particularized and standardized categorizations of mens rea." *Carrell v. United States*, 165 A.3d 314, 323–24 (D.C. 2017) (footnote omitted). We added that, "in the absence of a

---

[12] We do not deal here with the elements of offenses such as assault with intent to kill, assault with intent to commit robbery, or assault with intent to commit first degree sexual abuse, second degree sexual abuse, or child sexual abuse. *See* D.C. Code § 22-401.

statutory scheme setting forth such categorizations, we, like the Supreme Court, look to the Model Penal Code terms and their definitions." *Id.* at 324.[13]

But the absence of statutory direction does not give us latitude to design as we please. For more than a century, our common law decisions have supplied the mens rea required for the various forms of assault; we therefore do not write on a blank slate. Moreover, when interpreting criminal statutes that are silent with respect to the required mental state, we read into the statute "only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct.'" *Elonis v. United States*, 575 U.S. 723, 736 (2015) (quoting *Carter v. United States*, 530 U.S. 255, 269 (2000)). We also recognize that "basic principles of statutory construction in the criminal law context . . . necessitate[] proof of mens rea with respect to both its conduct and result elements." *Carrell*, 165 A.3d at 320 (citing *Elonis*, 575 U.S. at 738-39).

---

[13] This limited borrowing of useful terms found in the Model Penal Code does not imply that we endorse the general approach to criminal liability proposed in that code. In particular, the Model Penal Code does not recognize offensive touching assaults of a non-sexual nature. *See* Model Penal Code § 211.1 (defining assault by relying on concept of "bodily injury to another"); § 210.0(2) (defining "bodily injury" to mean "physical pain, illness or any impairment of physical condition"). The Council of the District of Columbia has not adopted the Model Penal Code, nor have we purported to do so. We must, instead, construe the common law offense referred to in our assault statute.

In a case like this, making contact with a victim (the "touching" portion of an offensive touching) cannot be inadvertent.[14] In Model Penal Code terms, it must be the defendant's "conscious object to engage in conduct of that nature." Model Penal Code § 2.02(2)(a)(i) (Am. Law Inst., Proposed Official Draft 1962) (defining "purposely").

Our examination of mens rea cannot end here, however. "[T]he presumption in favor of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994).[15] In circumstances like these, what makes the contact a crime is the offensive nature of the touch.[16] *Cf. Elonis*, 575 U.S. at 737 ("Here

---

[14] *See, e.g.*, *Buchanan v. United States*, 32 A.3d 990 (D.C. 2011); *In re J.S.*, 19 A.3d 328, 334 (D.C. 2011); *Frye v. United States*, 926 A.2d 1085, 1100 (D.C. 2005). *See also Nelson v. Carroll*, 735 A.2d 1096, 1100 (Md. 1999) (civil action for battery; "a purely accidental touching, or one caused by mere inadvertence, is not enough to establish the intent requirement for battery"); Model Penal Code § 2.01(1) ("A person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act or the omission to perform an act of which he is physically capable.").

[15] Of course, as discussed above, the statute itself does not specify the elements of assault. Those are derived from the common law. This distinction does not affect our analysis of the mens rea issue.

[16] Some contact with others is "reasonably necessary for the common intercourse of life," and the common law has always contemplated that innocuous contact, "done for the purpose of such [daily] intercourse only," does not amount

(continued…)

the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication." (internal quotation marks omitted)); *X-Citement Video*, 513 U.S. at 73 ("[T]he age of the performers is the crucial element separating legal innocence from wrongful conduct.").

Appellant emphasizes that some common law sources referred to touching another "in anger," *see Cole v. Turner,* 90 Eng. Rep. 958; 1 William Hawkins, *A Treatise of the Pleas of the Crown* at 263-64 (6th ed. 1788); "in an angry, or revengeful, or rude, or insolent manner," *see* Hawkins, *id.*; or "willfully or in anger," *see* Robert Desty, *A Compendium of American Criminal Law* § 130e, at 417 (1882), but these precedents do not oblige us to use words such as "angry" or "rude" or to treat an offensive touching assault as if it were (in the old style) a "specific intent" crime. Many of the reported decisions are too cryptic to be helpful in our present undertaking, and it seems from our current vantage point that the judges who wrote them (or the reporters who summarized oral rulings from the bench) were no more successful than we have been in articulating the nuances of

_____

(…continued)

to assault or battery. Sir James Fitzjames Stephen, A Digest of the Criminal Law, Article 241 at 177 (London, 3rd ed. 1883). *See Coward v. Baddeley*, 157 Eng. Rep. 927, 928 (Exch. 1859) ("Touching a person so as merely to call his attention . . . is not the ground of criminal proceeding."); *Cole v. Turner*, 90 Eng. Rep. 958 (K.B. 1704) ("If two or more meet in a narrow passage, and without any violence or design of harm, the one touches the other gently, it is no battery.").

mens rea. *See Voisine v. United States*, 579 U.S. 686, 698 (2016) ("The common law traditionally used a variety of overlapping and, frankly, confusing phrases to describe culpable mental states . . . ."). The essence of these authorities is to recognize that some touchings which give offense should qualify as crimes and others should not. Rather than turning back to old forms of speech to identify the dividing line, we will continue the trend already described.

We therefore hold that the mens rea requirement for the offensiveness of a touch may be satisfied by applying the Model Penal Code concepts of purpose and knowledge. *See generally Carrell*, 165 A.3d at 324 (explaining that, with regard to the "result element" of our threats statutes — which lack an explicit mens rea requirement, "the government may carry its burden of proof by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat"). *See* Model Penal Code § 2.02(2)(a)(i) (a person acts purposely with respect to a result of his conduct if it is "his conscious object . . . to cause such a result"). Similarly here, touching someone for the purpose of offending him clearly would satisfy the mens rea requirement. But while a purposeful state of mind surely will suffice, it is not necessary; actions taken with knowledge that the touching will be offensive also "separate wrongful

conduct from otherwise innocent conduct," *see Elonis*, 575 U.S. at 736 (addressing the crime of communicating a threat) (internal quotation marks omitted).

"A person acts knowingly with respect to a material element of an offense when: . . . if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result." Model Penal Code § 2.02(2)(b)(ii). Such awareness may be proven by direct or circumstantial evidence. Contrary to appellant's argument, it is not necessary to adopt the formulation "subjective intent to offend" in order to avoid "criminalizing inadvertent rudeness." *See Borden v. United States*, 141 S. Ct. 1817, 1823 (2021) (plurality opinion) ("A person who injures another knowingly, even though not affirmatively wanting the result, still makes a deliberate choice with full awareness of consequent harm.").[17]

Furthermore, in assessing the offensive nature of the contact, the finder of fact must consider the totality of the circumstances. A touching is offensive if it

---

[17] *See also United States v. Bayes*, 210 F.3d 64, 69 (1st Cir. 2000) ("[I]n a prosecution for simple assault under [18 U.S.C.] § 113(a)(5), it is sufficient to show that the defendant deliberately touched another in a patently offensive manner without justification or excuse."; "the common law provided that an assault committed by way of a battery did not require an intent to cause or to threaten an injury").

"offends a person's reasonable sense of personal dignity." *Holder v. District of Columbia*, 700 A.2d 738, 743 n.6 (D.C. 1997).[18] When the principles we have endorsed (purpose, knowledge, and reasonableness) are properly applied, there is no realistic danger that a defendant will inadvertently commit an offensive touching assault.

## G. Recklessness Deferred

Although the parties have briefed the issue, we do not need to decide whether recklessness will suffice as the mens rea for an offensive touching assault.[19] The trial court did not base its finding of guilt on recklessness.

---

[18] Although *Holder* arose from a civil suit, both parties rely upon the decision to support their respective arguments for how courts should judge the offensiveness of a touch. We agree that *Holder* provides an appropriate test for this type of criminal case. Citing sources discussing the law of torts, the government urges us to go further and extend criminal liability to situations where the victim is unusually sensitive as to personal dignity but the defendant touches him purposely, knowing of that particular sensibility. Appellant argues that, even if courts would recognize tort liability in such circumstances, that doctrine should not be extended to criminal law. We need not reach the issue because the trial judge found that, in the circumstances of this case, "objectively a person reasonably would find that intentional contact after the warning to be objectionable and offensive."

[19] Under the Model Penal Code, "[a] person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.

(continued…)

Moreover, cases where the evidence shows only recklessness, but not purposeful or knowing conduct, should be rare, and it is challenging to create realistic and helpful hypotheticals. "[W]e prefer to make a more informed judgment on the question whether recklessness suffices in the context of a factual situation that concretely presents the issue . . . ." *Carrell*, 165 A.3d at 325. "Such prudence is nothing new." *Elonis*, 575 U.S. at 741; *see id*. at 740 (declining to address whether the mental state of recklessness would be sufficient to prove the crime of communicating a threat under 18 U.S.C. § 875(c)); *Bailey*, 444 U.S. at 407 (declining to decide whether a prisoner could be convicted of escape "on evidence of recklessness or negligence with respect to the limits on his freedom," even though a "court may someday confront a case" presenting the issue); *Carrell*, 165 A.3d at 325 ("[W]e leave for another day whether a defendant can be found guilty of the crime of threats based on a showing that he recklessly uttered words as a threat.").[20]

---

(…continued)
The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Model Penal Code § 2.02(2)(c).

[20] We have not overlooked, nor do we question, our decision in *Vines v. United States*, 70 A.3d 1170 (D.C. 2013), where we upheld a conviction for simple assault based on reckless conduct. In that case, the driver of a vehicle "led police on a high-risk chase down a busy street in downtown Washington," resulting in a

(continued…)

### III.   The Evidence Was Sufficient

When the charge of assault is based on an offensive touching, it is fruitless to think of the crime as "an attempt with force or violence to do a corporal injury to another."  Quoting *Patterson*, 43 App. D.C. at 506.  Instead, we should recognize that the conduct is an assault because it is a completed battery.  The government must prove that the defendant (1) touched another; (2) that he did so purposely, not by accident; (3) that the touching offended the other person;[21] (4) that the touching would offend a person's reasonable sense of personal dignity; and (5) that the

_____

(…continued)

violent collision with another vehicle.  *Id*. at 1179.  Without resolving whether the government was required to prove intent to injure or only the intent to commit the acts constituting the assault, we held that reckless conduct was "enough to establish the intent [necessary] to convict [the defendant] of simple assault."  *Id*. at 1180.  "Even if the greater proof was necessary, the jury could permissibly infer such intent from Vines' extremely reckless conduct, which posed a high risk of injury to those around him."  *Id*. at 1181.  *Vines* is not factually comparable to this case, and we need not rely upon the concept of recklessness to be satisfied that the evidence was sufficient to prove that appellant acted with the requisite mens rea.  He touched Mr. Tarawallie on purpose, knowing (that is, being "aware that it [was] practically certain") that his conduct would cause offense.  *See* Model Penal Code § 2.02(b)(ii) (definition of "knowingly").

[21] In an unusual case, this third element may have to be modified to say "offended or would have offended."  For example, if the victim does not testify but witnesses describe what happened, they may be able to establish that the touch would have offended the victim.

defendant either acted with the purpose of causing offense *or* acted knowing that the touching would cause offense.[22]

Appellant does not dispute that he touched Mr. Tarawallie deliberately or "purposely."[23] Furthermore, in the circumstances of this case, a reasonable fact-finder could conclude that the touching was offensive. Although Judge Wynn did not use terms from the Model Penal Code, she found facts sufficient to permit the conclusion that appellant knew the victim would find the contact offensive but touched him nevertheless.

---

[22] As discussed above, to act "purposely" means that it was the defendant's "conscious object" to engage in conduct of that nature or to cause such a result. A person acts "knowingly" when he is aware that it is practically certain that his conduct will cause that result.

[23] During his closing argument, appellant's counsel acknowledged that "Mr. Winston Perez touches him again," but asserted that "it was not an offensive touch in and of itself based on their prior history together as friends, as acquaintances, and they're both drinking and watching the game together. He's kind of taunting him, ha ha ha, . . . with a bad judgment, perhaps. Was it an assault? No." After the trial court announced its findings, appellant's counsel stated "we don't really dispute the factual findings, just . . . whether or not he crossed the line to commit an actual legal offense . . . ." While asserting that this was not enough to prove an offense, appellant acknowledges in his brief that the evidence credited by the trial court supported a finding that appellant touched Mr. Tarawallie on the arm after being warned not to do so. Brief for Appellant at 30, 33.

Before pronouncing appellant guilty, the court explained, "I think if we had one poke that it would not meet the requirements of something that would be objectively offensive to a person of reasonable sensibility . . . ." In this case, however, there was a second poke after an admonition "don't poke me or if you do that again I'll punch you, or do it and see what happens . . . ." The warning made a crucial difference. "[N]ot only does that indicate that this person objectively [sic] finds the poking offensive, but also that objectively a person reasonably would find that intentional contact after the warning to be objectionable and offensive." "So I find the defendant guilty in this matter."

Nevertheless, the court did not expressly state that appellant "knew" that Mr. Tarawallie would be offended, and it is not clear that such a finding is implicit in what the court said. Under these circumstances, we remand the case to the trial court for further findings on whether appellant knew when he acted that the touching would offend Mr. Tarawallie.

## IV.   Other Issues

### A.  Factual Findings

In addition to contesting the sufficiency of the evidence, appellant asserts that his conviction must be reversed because the trial court relied upon two clearly erroneous factual findings.  Brief for Appellant at 30 ("The trial court's findings that appellant 'poked' the complainant, and that the two were 'not close' friends, were clearly erroneous.").  We are not persuaded either that the findings were clearly erroneous or that they would affect the court's finding of guilt if they were.

Because the amount of force used does not matter, nothing turns on whether appellant "poked" Mr. Tarawallie instead of "touched" him.  Appellant told Detective Savoy that he touched Mr. Tarawallie on the arm again, and Mr. Baez testified that he saw appellant touch Mr. Tarawallie again after being told not to do so.  The court knew that the two men "were at least acquaintances and maybe could even be described as friends."  The closeness of their relationship might be material if appellant Perez Hernandez did not anticipate that Mr. Tarawallie would find his actions offensive, but the trial court found that Mr. Tarawallie gave an explicit warning before appellant touched Mr. Tarawallie again.

## B.  There Was No Prejudicial Variance

In his original brief appellant raised two additional issues that the division did not reach.  We address those issues now instead of referring them back to the division.

Appellant argues first that there was a prejudicial variance because the government changed its theory of the case during rebuttal argument.  We are not persuaded.  Using the language of the statute, the information charged that appellant "unlawfully assaulted and threatened Alimamy Tarawallie in a menacing manner."  "The government did not specify in the information the means by which the assault was committed, but it had no obligation to do so."  *Burgess v. United States*, 681 A.2d 1090, 1096 (D.C. 1996).  Appellant did not move for a bill of particulars.

The affidavit in support of the arrest warrant (for assault with a dangerous weapon – the bottle) explained that appellant kept touching Mr. Tarawallie, who asked appellant to stop.  The affidavit also mentioned that appellant placed his finger in the victim's eye, hit him with a beer bottle, and struck him with closed

fists.  After appellant was arrested, the government charged simple assault instead of ADW.

The prosecutor previewed the evidence in her opening statement.  Before appellant struck Mr. Tarawallie with the beer bottle, she said, appellant touched Mr. Tarawallie with his finger and was told to stop; Mr. Tarawallie also told others nearby that he didn't want appellant touching him.  Nevertheless, appellant approached, put his finger in Mr. Tarawallie's eye, and "basically said what are you going to do?"  In response, Mr. Tarawallie pushed appellant with both hands, and appellant struck Mr. Tarawallie with the bottle.  The witnesses discussed all of these aggressive actions.

When the prosecutor shifted her focus from the beer bottle to the offensive touching, as described above, defense counsel did not seek a continuance, request a mistrial, or ask to reopen the evidence, perhaps because he did not dispute that the touching occurred.  Instead, he argued at some length that the touching was not a crime.  Before the court ruled, counsel filed a legal memorandum agreeing that an offensive touching could constitute assault, but repeating his argument from closing that the context of the interchange made this touching friendly and not offensive.

"A variance occurs when the evidence at trial proves facts materially different from those alleged in the indictment or information." *Burgess*, 681 A.2d at 1096. We are not confronted with such a situation here. Indeed, this case is much like *Burgess*, where the defendant was convicted of assaulting a bus driver. He complained on appeal that the government had led him to believe "that it considered the throwing of rocks and bottles, rather than the use of mace, to be the conduct underlying the assault charge." *Id*. We held that no variance occurred. As was the case here, the information used the language of the statute and did not specify the means by which the assault had been committed. *Id*. We emphasized that "assaults tend to be committed in a single continuous episode rather than in a series of individually chargeable acts," *id*. (internal quotation marks omitted), and the defendant had not moved for a bill of particulars. *Id*. at 1097. Thus, it made no difference "whether the government prove[d] an assault by introducing evidence that the defendant sprayed mace on the complainant or by proving that he threw rocks and bottles." *Id*.

We also observed that Mr. Burgess's claim would fail even if he could demonstrate that a variance occurred. 681 A.2d at 1097 n.8. "When asserting a variance, a defendant has the affirmative obligation to show prejudice to the

defense." *Id*. Burgess had not done so. Similarly here, the record reveals that appellant was not surprised, and he has not demonstrated that he was prejudiced.

### C. Rule 23(c) Findings

Appellant also asserted that we should remand the case to the trial court "to provide findings compliant with Rule 23(c) as requested by defense counsel before trial." We decline to do so.

Before the first witness was called, defense counsel informed the court that "we're asking for [Rule 23(c)] findings at the conclusion of the trial as always."[24] Counsel did not specify what findings he wanted the court to make. Twenty days later, before announcing that it found appellant guilty of assault, the court made extensive findings, some of which are detailed above. It then asked the parties whether they had "any questions about the factual findings or the verdict, anything that you want me to clear up in case another court is looking at this at some point" in the future? Appellant's counsel said "No, Your Honor." Under these

---

[24] Counsel was referring to Super. Ct. Crim. R 23(c), which at the time provided that, in a non-jury trial, "the Court shall make a general finding and shall in addition, on request made before the general finding, find the facts specially."

circumstances, appellant is not entitled to the remand he now requests. *See Preacher v. United States*, 934 A.2d 363, 368 (D.C. 2007) ("Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take.").

## V. Conclusion

The evidence was sufficient to prove the elements of an offensive touching assault, but we vacate the judgment and remand the case for the trial court to make explicit findings on whether appellant knew when he acted that the touching would offend Mr. Tarawallie.

*So ordered*.

BLACKBURNE-RIGSBY, *Chief Judge*, with whom SHANKER, *Associate Judge*, joins, concurring in part: I join the opinion of the court, except to the extent that the court concludes that a remand is necessary. The trial court implicitly concluded that appellant "knew" that his touch would offend Mr. Tarawallie. Here, appellant poked Mr. Tarawallie two times, one of which came "after a

statement of if you do that again you'll see what happens[.]" The trial court explained,

> once the person says don't poke me, or if you do that again I'll punch you, or do it and see what happens, not only does that indicate that this person objectively finds the poking offensive, but also that objectively a person reasonably would find that intentional contact after the warning to be objectionable and offensive.

The trial court further explained that "[i]t's simply a question of whether the person who is being touched, whether that person is reasonable in finding the touching to be offensive." These findings are sufficient under the standard set forth in the majority opinion that the trial court must find that "appellant knew when he acted that the touching would offend Mr. Tarawallie." Therefore, in my view, a remand is not necessary. In all other respects, I join.

EASTERLY, *Associate Judge*, concurring *dubitante*: At first blush, the question presented in this case—whether the act of touching another person after being asked not to do so is an assault—may seem inconsequential and not worth the extensive amount of time devoted to its consideration. But answering this question, which invites consideration of where the outer boundaries of the criminal law lie and when law enforcement should be used to enforce social norms, has

proved difficult for our court because the assault statute provides us with no guidance. We maintain we have the common-law authority to "clarify" the elements of a new iteration of assault. I disagree that this is what we are doing. But I am bound by our prior pronouncements that we have the authority to continue to develop the criminal common law, even though such pronouncements seem anachronistic at best. In this era, legislatures, not courts, decide what is or is not a crime and how it should be punished. And our legislature has recently acted in this sphere: On November 15, 2022, the Council of the District of Columbia approved legislation that does not recognize nonviolent, nonsexual offensive touching as an assault; rather, it creates a lesser crime of "Offensive Physical Contact" in § 22A-2206 of the newly Revised Criminal Code. Under the circumstances, I question whether our court should exercise our common-law authority to expand the crime of assault. But if we are going to recognize this new iteration of assault, I agree remand is in order.

I am reluctant to sign on to the decision of the en banc court for four reasons:

First, we are breaking new ground as an en banc court. The assault statute provides us with no guidance, and neither does our precedent, the en banc opinion's reliance thereon notwithstanding. As the opinion reflects, in the past century we (and our predecessor courts) have identified conduct as criminal assault only where there was:

- a beating or whipping (or at the very least slapping that led to bleeding) (*Mostyn v. United States*, 64 F.2d 145 (D.C. 1933); *Landrum v. United States*, 63 F.2d 990 (D.C. 1933); *Delaney v. United States*, 190 A.2d 100 (D.C. 1963); *Lee v. United States*, 831 A.2d 378 (D.C. 2003); *Alfaro v. United States*, 859 A.2d 149 (D.C. 2004); *Lewis v. United States*, 938 A.2d 771 (D.C. 2007); *Contreras v. United States*, 121 A.3d 1271 (D.C. 2015));

- rape, attempted rape, and other forms of sexual assault, including against children (*Beausoleil v. United States*, 107 F.2d 292 (D.C. Cir. 1939); *Ingram v. United States*, 110 A.2d 693 (D.C. 1955); *Guarro v. United States*, 237 F.2d 578 (D.C. Cir. 1956); *In re A.B.*, 556 A.2d 645 (D.C. 1989); *Smith v. United States*, 593 A.2d 205 (D.C. 1991); *Mungo v. United States*, 772 A.2d 240 (D.C. 2001));

- pointing a gun at or shooting another (*Robinson v. United States*, 506 A.2d 572 (D.C. 1986); *Ruffin v. United States*, 642 A.2d 1288 (D.C. 1994); *Mobley v. United States*, 101 A.3d 406 (D.C. 2014));

- shoving a security guard (*Dunn v. United States*, 976 A.2d 217 (D.C. 2009));

- crashing a car into another car (*Vines v. United States*, 70 A.3d 1170 (D.C. 2013));

- spitting (*Ray v. United States*, 575 A.2d 1196 (D.C. 1990));

- pickpocketing or attempted robbery (*Harris v. United States*, 201 A.2d 532 (D.C. 1964); *Anthony v. United States*, 361 A.2d 202 (D.C. 1976));

- taking a phone and a cigarette from another's hand (*Mahaise v. United States*, 722 A.2d 29 (D.C. 1998)).

*Ray* and *Mahaise* present the only two scenarios remotely close to the present case of an unwanted contact between friends at a World Cup viewing party, and even they are a long way off, as *Ray* involves bodily fluids and the defendant in *Mahaise* appeared to commit not only a "threatening" act, but also a form of larceny, 722 A.2d at 30. Perhaps the *Harris* case, involving a mere pickpocketing without any violence, is also somewhat closer to our present fact pattern. But like a number of the early common-law cases, it has troubling racial undertones, undermining its precedential strength. *See Harris*, 201 A.2d at 533-35 (finding that when complainant, who spoke only German, "felt himself being jostled, feeling impact at the area of his hip pocket," by a "Negro" defendant, the force was sufficient for assault). The fact that we are issuing an opinion en banc affirming that a nonviolent, nonsexual offensive touching is an assault is itself proof that we are putting a new type of crime under the assault umbrella.

Second, I question our judicial crime-creation authority. In particular, I am skeptical that when Congress codified the common law of assault such as it existed in 1901 it intended to delegate to judges the perpetual power to revise and expand upon this crime in whatever way we saw fit. *But see ante* at 12. It is likewise unclear to me that D.C. Code § 45-401, providing that the common law in force in 1901 "shall remain in force except insofar as the same are inconsistent with, or are

replaced by, some provision of the 1901 Code," gives us such authority, *but see ante* at 11, since the 1901 Code did codify the crime of assault.

While I recognize that *we* have decided that we have the power to continue to develop the criminal common law, *see ante* at 12, there is a difference in my view between interpreting the common law with a purpose to ensure due process and double jeopardy guarantees are realized[1] and announcing new grounds for criminal conviction. The former seems well within our judicial role to uphold the Constitution, but at least in the modern era "[i]t is the responsibility of the legislature, not the Court, . . . to define a crime, and ordain its punishment." *Bond v. United States*, 572 U.S. 844, 867 (2014) (Scalia, J., concurring) (internal quotation marks omitted). Since Congress granted the District home rule, the Council of the District of Columbia has spoken for the people of this jurisdiction, deciding whether certain conduct is a crime and, if so, how to categorize, define, and punish it.

---

[1] *See, e.g.*, *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc) (reading in a mens rea element to the codified common-law crime of threats); *Comber v. United States*, 584 A.2d 26 (D.C. 1990) (en banc) (clarifying mens rea elements for codified common-law crimes of murder and manslaughter); *United States v. Bradford*, 344 A.2d 208 (D.C. 1975) (holding that the codified common-law crime of manslaughter encompasses voluntary and involuntary iterations that must be separately charged).

Third, this case presents fundamental and elemental questions—questions that, in a representative democracy, are arguably far better addressed by the Council as our legislative body—about the boundaries of the criminal law and the concomitant use of law enforcement to maintain socially acceptable behavior. Recognizing that unwanted nonviolent, nonsexual contact can occur in myriad situations, it should be up to the Council to decide if any iteration of this crime should be classified as a form of assault or some other type of crime. It should be up to the Council to determine the essential elements that must be proved to justify an arrest, a criminal prosecution, and potential imprisonment as a penalty. It should be up to the Council to determine what defenses (if any) can be raised to such a charge. And it should be up to the Council to determine the appropriate punishment for such a crime.

Fourth, our venture into common-law crime creation is inopportune. Recognizing that, in contrast to the majority of states around the country, the District failed to modernize its criminal laws in the mid or late 20th century, the Council created the Criminal Code Reform Commission in 2016 to rewrite many of our criminal laws and directed it, inter alia, to "use clear language," "apply consistent, clearly articulated definitions," "describe all elements, including mental

states, that must be proven," "reduce unnecessary overlap and gaps between criminal offenses," and "identify any crimes defined in common law that should be codified, and propose recommended language for codification, as appropriate." D.C. Code § 3-152(a). The Commission was charged with delivering a report to the Council including draft legislation and explaining how and why the recommendations change existing law. D.C. Code § 3-152(b). After five years of work and with the unanimous support of an advisory group composed of the U.S. Attorneys' Office, the Office of the Attorney General, the Public Defender Service, and law professors, the Commission did just that. *D.C. Criminal Code Reform Commission (CCRC) Recommendations for the Council and Mayor* 4 (2021), https://ccrc.dc.gov/sites/default/files/dc/sites/ccrc/publication/attachments/Revised-Criminal-Code-RCC-Compilation.pdf; https://perma.cc/9X5B-A4PL ("*CCRC Report*"). The Council unanimously approved the Revised Criminal Code Act of 2022, which adopted the Commission's recommendations nearly in their entirety, just last month. *B24-0416 – Revised Criminal Code Act of 2021*, Council of the District of Columbia, https://lims.dccouncil.gov/Legislation/B24-0416; https://perma.cc/EF3L-CRDN (click "View Voting Details" for entry dated November 15, 2022).

As defined by the Revised Criminal Code, the crime of assault does not extend to an unwanted touching that is neither violent nor sexual. Revised Criminal Code Act of 2022, Bill No. 24-416, §§ 22A-2203, -2301 (2022) ("RCC"); Appendix J, *CCRC Report*, at 381-82, https://ccrc.dc.gov/sites/default/files/dc/ sites/ccrc/publication/attachments/Appendix-J-Research-on-Other-Jurisdictions-Relevant-Criminal-Code-Provisions.pdf; https://perma.cc/WZ9S-W2LY (explaining that limiting assault to inflicting bodily injury or using overpowering physical force aligns with national legal trends). Rather, the Council created a lesser, new crime of offensive physical contact. RCC § 22A-2206; Appendix J at 402-05. This new non-assault crime has distinct elements[2] and specific exclusions and defenses to prevent over-expansive application. *Id.* And under the new sentencing scheme laid out in the Revised Criminal Code, this new non-assault crime is subject to much less harsh punishment than our crime of simple assault (a maximum of 10 days imprisonment versus 180 days). *Compare* RCC §§ 22A-2206(e)(2), -603(13), *with* D.C. Code § 22-404(a)(1).

---

[2] In pertinent part, it provides that "[a]n actor commits second degree offensive physical contact when the actor: (1) Knowingly causes the complainant to come into physical contact with any person or any object or substance; (2) With intent that the physical contact be offensive to the complainant; and (3) In fact, a reasonable person in the situation of the complainant would regard it as offensive." RCC § 22A-2206(b); *see also id.* § 22A-207(a) (explaining rules of interpretation applicable to culpable mental states).

Under the circumstances, I question our exercise of our common-law power in this case to temporarily recognize—at least until the new revised code takes effect, *see* RCC tit. V, § 501(a)(1)—a new form of assault based on a nonviolent, nonsexual touching.  In light of the legislature's clear pronouncement that the conduct at issue in this case is not an assault, we could have dismissed en banc review as improvidently granted.  But accepting that the en banc court has chosen to recognize a new form of simple assault, I agree that we should remand the case to allow the trial court to assess Mr. Perez-Hernandez's guilt of this offense.